230 P.2d 667]

[Civ. No. 14505.  First Dist., Div. One.  May 1, 1951.]

Estate of ALICE A. MILLER, Deceased.  THE PEOPLE, Appellant, v. J. HOWARD McGRATH, as Attorney General of United States, Respondent.

Edmund G. Brown, Attorney General, W. R. Augustine and B. Abbott Goldberg, Deputy Attorneys General, for Appellant.

Harold I. Baynton, Assistant Attorney General of United States, Frank J. Hennessy, United States Attorney, Valentine C. Hammack and Lillian C. Scott, Special Assistants to Attorney General of United States, George B. Searls and Joseph Laufer, Attorneys, Department of Justice, for Respondent.

BRAY, J.—Appeal by the State of California, petitioner in intervention, from probate decree in favor of the Attorney General of the United States, objector, determining rights under section 259 of the Probate Code.

### QUESTIONS PRESENTED

1. Does the evidence show that on April 22, 1942, reciprocal rights of inheritance existed as to personal property between the United States and Germany?

2. Does the right to receive payment provided in section 259 of the Probate Code mean *immediate* payment?

3. Is *Estate of Schluttig*, 36 Cal.2d 416 [224 P.2d 695], res judicata as to this case?

4. May the effect and application of foreign law be proved by circumstantial evidence?

RECORD

Alice A. Miller, an American citizen, died testate in Oakland, California, on April 22, 1942. She left the entire residue of the estate, consisting of both real and personal property, in equal shares to Wilhelmina Gramann and Dorette Brunotte, first cousins and her only relatives. Wilhelmina Gramann, unmarried and a citizen and resident of Germany, had predeceased the testatrix without leaving issue. Thus, Dorette Brunotte, likewise a citizen and national of Germany, was testatrix' sole surviving heir and next of kin. On September 19, 1944, she, too, died. Acting under the Trading With the Enemy Act, the Alien Property Custodian vested the interests of both residuary legatees. (Vesting Order No. 2803.)

The executors filed a petition for partial distribution, listing certain real and personal property as available for immediate distribution and stating that the State of California and the custodian were asserting conflicting claims to the legacies. The state filed a petition in intervention alleging that on April 22, 1942, American citizens had no right to take property or to receive payment from German estates, and hence, the two German legatees were rendered ineligible by section 259 of the Probate Code to take under the will, and, there being no other heirs or next of kin, the estate escheated to the State of California as provided in section 259.2. The Alien Property Custodian answered the petition, as did the executor, denying the asserted absence of reciprocal inheritance rights for American citizens in Germany, and in reliance on his vesting order asked that the residuary estate be distributed to him.

Following the decision in *Clark* v. *Allen,* 331 U.S. 503 [67 S.Ct. 1431, 91 L.Ed. 1633, 170 A.L.R. 953] (holding that the treaty of 1923 between the United States and Germany governs the testamentary disposition of realty, but that the disposition of personal property is governed by California law, and that section 259 of the Probate Code is constitutional) the custodian's claim to the realty was no longer questioned. The question of whether reciprocal inheritance rights existed between the two countries is limited solely to the personal property.

The probate court found that on April 22, 1942, under the laws of Germany, American citizens did enjoy reciprocal rights with German citizens as to personal property and money

inherited from German estates. It found that the residuary legacy of Wilhelmina Gramann had lapsed and that the custodian, as successor in interest to Dorette Brunotte, only surviving heir, was entitled to the distribution of the entire estate. A final decree was entered distributing the estate to the custodian. (The Attorney General of the United States has succeeded to the rights and duties of the custodian and has been substituted in his place.)

### Law Involved

At the time of the death of the decedent, section 259 of the Probate Code provided: ''The rights of aliens not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are inhabitants and citizens and upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign countries.''

Section 259.1 provided that the burden of establishing that reciprocal rights exist is on the nonresident alien (here the United States Attorney General). As said in *Estate of Schluttig, supra,* 36 Cal.2d 416, at page 424: ''. . . the issue to be determined involved questions as to the existence, translation, interpretation and effect of the laws of Germany . . . The determination of the issue, therefore, was one of fact, and the finding of the trial court, if supported by substantial evidence, will not be disturbed on appeal.'' Therefore, the matter for us to determine is whether there is substantial evidence to support the court's finding of the existence of reciprocity on April 22, 1942.

1. *Sufficiency of the Evidence*

The evidence consisted of German laws, documentary evidence, and the conflicting testimony of certain experts on German laws. The issue before the superior court required a consideration not only of the existence of the foreign statutes but a finding as to their effect based upon the translation of them and their practical application by the German courts.

The parties did not agree as to the correct translation of the statutes and each stressed uncertainties and ambiguities which required explanation. Moreover, it was shown that the right to inherit in the foreign countries depended upon certain policies of the Nazi regime. Upon all of these subjects both parties presented considerable testimony by experts. Respondent introduced the texts of the German laws relating to inheritance.* Without exception, these laws refer to persons without distinction as to race or nationality. Neither Americans nor aliens generally are mentioned in the German Civil Code which was still in effect during the entire Nazi regime. Section 48 of the German Law Concerning Last Wills and Testaments of 1938 provided: ''(1) A disposition for the event of death is void insofar as it is contrary to mandatory provisions of law. (2) Any disposition for the event of death is void insofar as it is contrary—because of being grossly opposed to sound sentiment of the people—to considerations which a decedent who is conscious of his duties, must have towards his family and the community of the people.''

Dr. von Lewinski, a German national, testified for respondent. He qualified as an expert on German law. He studied law in this country at Harvard and Columbia Law Schools and in 1907 was appointed a judge of the County Court at Berlin where he served for a year and a half. For the next 10 years he was an assistant in both the Prussian Department of Justice and the Federal Department of Justice and also a Justice of the Court of Appeals of Berlin. From 1922 to 1932 he served in the United States as German Agent for the Mixed Claims Commission, Consular of the German Embassy and Consul General in New York. Upon his return to Germany in 1932 he practiced law in Berlin until approximately the time of trial herein, specializing in probate law. He testified that he had handled four to five hundred cases in which Americans had inherited estates in Germany and vice versa; that before the war the right to inherit was recognized and the assets transferred; that the German inheritance laws are contained in the German Civil Code, Fifth Book, and that article 154 of the Weimar Constitution enacted in 1919 recognized and guaranteed the right to inherit in accord with the Civil Code. Translations of these were in evidence. Also,

*All discussion herein of German laws and conditions in Germany relates to the situation as of April 22, 1942, unless otherwise stated.

at the time here in question, there were no other laws in Germany having any bearing on the right of inheritance.

With respect to the pertinent sections of the Civil Code, and the right to inherit and succeed, this witness testified that no distinction was made between nationals of Germany and foreigners, including American citizens; that under the German laws of inheritance any foreigner may succeed to an estate in Germany on the same terms as a national of that country. He further testified that this right of inheritance remained intact throughout the Nazi regime and that no laws were enacted which in any way abrogated it. At the outbreak of war actual transfers of property inherited by American citizens were discontinued. Thereafter their property was placed in the hands of administrators who were subject to the control of the courts. The title of the enemy alien was not disturbed, and Germany never passed legislation confiscating enemy property. Dr. von Lewinski, himself, was appointed by the court in a number of instances as custodian of the interests of American heirs.

The witness further declared that the Law of Wills of 1938 was not construed as applying to or affecting wartime gifts to belligerents. He had never heard of a single decision in which a legacy to an American had been held void under the statute. On the contrary, in each of the cases he handled during the war the courts issued orders declaring Americans entitled to share in German estates and he personally knew that the prevailing practice conclusively showed that the courts did not regard a testamentary disposition to an American as ''opposed to sound sentiment of the people.''

Respondent introduced in evidence considerable documentary evidence of reciprocal rights. There were 57 certificates of inheritance (Erbscheine) which Dr. von Lewinski testified were judicial determinations of the probate courts of the several states, and which embody the decrees of these courts of record. These certificates cover the period 1938 to 1945 and determine the heirship of some 77 residents of the United States. The full war years, 1942, 1943, and 1944 are represented by 12, 17 and 19 certificates respectively. They were issued by probate courts in Germany, sitting in villages, cities and towns and in metropolitan centers such as Berlin, Munich and Stuttgart. With one exception, the American residence of the heir involved is shown without, however, disclosing citizenship.

Photostatic copies of two issues of the Deutscher Reich-

sanzeiger, in which government orders and official notices are published, were put in evidence. These publications show that the German Alien Property Custodian placed estates belonging to heirs resident in the United States under the charge of administrators who acted under court supervision. In at least four of these estates it is clearly indicated that either the decedents or the heirs were Jews.

Respondent introduced in evidence 25 declarations on official forms made to the German Finance Ministry by persons in charge of the property of American residents. These reports cover the period between September, 1941, and June, 1943. In each case the property includes an inheritance claim. These were submitted to prove that no change in treatment of ownership of inheritance claims occurred.

Dr. von Lewinski testified on the basis of personal experience, that between the establishment of foreign exchange control in Germany and the outbreak of the war, citizens of the United States were able to secure the transfer of property inherited by them upon application filed with the German exchange control authorities. In about 600 cases personally handled by him before the United States imposed freezing controls (Executive Order 8785, June 14, 1941) actual delivery was made to the American heirs. Among the American heirs whose interests he represented, some were of the Jewish faith, and they duly received their inheritances prior to the outbreak of the war. He recalled one Jewish estate in particular, the Garbet estate, in which 200,000 marks were transferred to the heir in New York in 1940. After the outbreak of war with the United States the actual transmission of inheritances to the United States ceased. As to such inheritances, however, he testified that they were put in the hands of administrators, while the alien's title was not disturbed.

To the same effect was the testimony of Mr. Hoecker, an attorney in San Francisco. He testified that from 1933 to 1941 he represented American heirs, among them American citizens of the Jewish faith, in approximately 25 probate cases in Germany, and that in every instance his clients received actual transfers of the amounts due them.

Copies of 10 separate official files of the Devisenstelle (Foreign Exchange Control Office) in Berlin were introduced in evidence. They contained correspondence, license applications and licenses actually issued for the transfer of estates from Germany to the United States. As to at least five of these it affirmatively appears that the applicants are American citi-

zens. Diplomatic correspondence relative to the transmission of funds was put in evidence. In an aide memoire of December 20, 1938, the German government unequivocally guaranteed the rights of American citizens to withdraw inheritances on a reciprocal basis.

Appellant called William B. Stern, since 1939 the Foreign Law Librarian of the Los Angeles County Law Library, who received a Doctor of Laws degree at the University of Wuerzburg in 1933, then entered the Bavarian State Preparatory Service for Jurists in 1933, from which he was discharged in 1934 because of nonAryan descent. He attended an English university, then had a Fellowship in International Law at the University of Texas, and spent a year at Johns Hopkins University studying international law. In 1936 he was an invitee of the Carnegie Endowment of International Law at the University of Michigan and for two years was in charge of the Chicago Law Library. He has made a study of German laws of inheritance and has testified considerably as an expert on foreign laws.

Appellant also called one Oppenheimer, who qualified as an expert on German law. He had studied at the Universities of Berlin, Freiburg, and Breslau, had experience in law offices, with the public prosecutor and then passed an examination which entitled him to become a judge or a practicing attorney, worked with the Mixed Arbital Tribunals established under the Treaty of Versailles, then returned to Germany where he practiced law for many years, handling a great deal of probate work in America, France and England, as well as in Germany. He remained in Germany three and one-half years under the Nazi regime and then practiced in England until 1940, came to the United States and joined a prominent New York law office working on international and foreign laws until 1943 when he was appointed Chief Analyst of the Board of Economic Warfare in Washington, D. C., working on the German and Austrian Nazi legal system. Later he was assigned to the legal division of G-5, Allied Expeditionary Forces, heading up a ''Special Legal Unit, Germany, Austria'' the objective of which was to investigate the Nazi legal system, to recommend changes so that the German law could be de-Nazified. Later he became Chief of German Law and Court Section with the United States Forces at Frankfurt, Germany. Subsequently he became Assistant Legal Adviser in the Department of State. He returned from Germany about a week before the trial.

In direct contradiction to the testimony of Dr. von Lewinski, both Stern and Oppenheimer testified that the German courts, in interpreting the law, leaned heavily on the commentaries in legal textbooks and periodicals. They then referred to certain commentaries and articles, which were introduced in evidence, which, particularly with reference to section 48, stated in effect that a last will is valid only to the extent to which the intention of the testator coincides with the intention of the community of law. Also, the leaving of property to the church to the elimination of near relatives, excepting wills of the clergy, to foreign associations of freemasons, nationals of an enemy state, the appointment of a Jew as heir by an Aryan testator, would make the will void. Other documents offered by appellant included: (1) Decree for the Settlement of Estates in Cases of Succession by Law in Special Cases, dated October 4, 1944, which states that a person named in a will who is unable to take under section 48 is likewise unable to take under the laws of intestacy. (2) Resolution of the Greater-German Reichstag of April 26, 1942, which among other things states that the Führer must, in his capacity as supreme lord of the judiciary, at any time, with all means he deems suitable, and without being bound by existing rule of law, be in a position to order any judge to fulfill his duties and without institution of prescribed procedures remove him from his office in case of violation of duties. (3) Law for the Revocation of Naturalizations and the Deprivation of German Nationality, July 14, 1933, which deprived German nationals abroad of their German nationality "if they have damaged German interests by a behavior which is contrary to their duty of loyalty against the Reich and Nation" or who do not obey an order of the Reich Minister of the Interior to return. (4) The Armament Law of May 21, 1935, which places the duty to carry arms on every Reich national although he also possesses a foreign nationality. (5) The Law Restricting the Rights of Succession and Inheritance Because of Antisocial Conduct, November 5, 1937, which states that a person deprived of his German nationality by any of the above-mentioned laws cannot take by succession or inheritance from a German national. There is then a provision that a testator may deprive a descendant of the compulsory portion of an inheritance if the descendant has married a Jew or Jewish person without certain permission. (6) Order concerning the Utilization of Jewish Property of 3 December 1938, providing that owners of Jewish enterprises, real estate,

"or other Jewish property" may be ordered to sell or liqui-date. (7) Procedure Concerning the Removal of Jewish In-fluence from Enemy Property, February 27, 1940, which provides in effect that enemy property which has more than a 50 per cent Jewish interest therein is deemed to have a decisive enemy influence and does not require approval of the Reich Commissar for the taking of compulsory measures to remove the Jewish influence. His approval must be had if the Jewish interest is less than 50 per cent. (8) 11th Decree for the Execution of the Reich Citizenship Law, November 25, 1941, a Jew loses German nationality if at the effective date of the decree he usually resides abroad, or thereafter takes up his usual residence abroad. The property of a Jew who loses his German nationality by this decree escheats to the Reich. "Persons whose property has escheated to the Reich" under this decree "may not acquire anything from a German national by cause of death." Gifts to them by German na-tionals are prohibited. The effect of these laws and decrees was disputed by the experts.

Both Stern and Oppenheimer testified that the Constitution of Weimar and the German laws permitting inheritance by Americans were not specifically changed by the Nazis. Yet, section 48, which in effect, prohibited disposition of property if it was "opposed to sound sentiment of the people," coupled with the fact that the judiciary were no longer independent but were, it is contended, subject to the will and whim of Hitler, denied to Americans any *right* to take testamentary disposition, and left such taking merely a *privilege* which might or might not be granted. While there is evidence from which such a conclusion can be drawn, it is not one that is impelled. Particularly is this so, when neither Stern nor Oppenheimer pointed to a single instance in which any Ger-man court had refused to recognize an American resident's or citizen's right to inheritance, and Dr. von Lewinski had referred to many specific instances of such recognition. While the commentaries took the position that the courts had the right to refuse inheritances to enemy aliens (which, of course, Americans were) and to American Jews, neither of appel-lant's experts knew of a case in which it was done. Moreover, the testimony of Dr. von Lewinski directly conflicted with that of Stern and Oppenheimer on the effect of these commen-taries and the effect and meaning of the various decrees and other documents in evidence. They even disagreed as to the effect of section 48 and its interpretation by the German

courts. Dr. von Lewinski was able to point to specific acts of the courts supporting his testimony and interpretation, while appellant's experts could not.

To an American it seems incredible that Hitler would permit German property to be distributed to Americans and particularly to American Jews. Yet, it definitely appears that the procedure provided by the Absentee Administration Decree for the appointment of an administrator for the inheritance of an absent national of an enemy country was followed, and that property of German testators was distributed to administrators appointed for the purpose of holding it for such enemies, including Americans. It may very well have been that Hitler, in spite of his hatred for both Jews and Americans, concluded that as a matter of expediency and shrewd business it was advisable to retain reciprocity with the United States because the number of estates in which property in Germany would be left to Americans would be inconsequential as compared to the number of estates in America left to Germans.

Appellant lays great value on the judgment in case No. 3, Tribunal III, entitled *United States* v. *Joseph Altstotter et al.* This was one of the Nuremburg trials held in 1947, in which 16 defendants who were former German judges, prosecutors or officials in the Reich Ministry of Justice, were found guilty of committing war crimes and crimes against humanity. The tribunal found, in effect, that while on paper the rights established by the Weimar Constitution were retained by the Nazis, there was a progressive degeneration of the judicial system under Nazi rule and that substantially every principle of justice enumerated by prior German law was violated by the Hitler regime. This judgment does not compel a conclusion that the rights of aliens as to inheritance was not recognized. The tribunal was dealing primarily with the denial of justice to the German residents and citizens, and their deprivation of fundamental constitutional rights. There can be no question but that had Hitler deemed it expedient to do so he could have caused the law as to inheritances or their effect to be changed, just as our California Legislature could, if it saw fit, change our inheritance laws as they affect aliens. But the question here is, did he do so? Apparently from the evidence in this case he did not, whether because he deemed it important not to stop the flow of inheritances from this country to Germany, or for some other reason. It is significant upon this question that the Nazis did not adopt a policy of

confiscating enemy property. It must be pointed out that section 259 does not require that foreign countries have the same judicial system as ours, nor even an independent judiciary. All that it requires is that there be no discrimination shown in inheritance matters as between the nationals of that country and the residents and citizens of ours.

Summing up appellant's evidence,—the German laws could have been interpreted by the German courts in such a way that the matter of inheritance in a foreign country did not exist as a matter of legal right, but was subject to the arbitrary action of Nazi administrators acting in accordance with Nazi ideology. The courts, too, could have interpreted testamentary dispositions to Americans to be "opposed to sound sentiment of the people," thereby directly discriminating against citizens of the United States because of their citizenship or residence. Had such been the interpretation of the German courts, that is, that the taking of estates by testamentary disposition or succession was merely a matter of sufferance and not one of legal right, there would be no "reciprocal right" as that term is used in the Probate Code. However, the trial court, on conflicting evidence, found that the German courts adopted a different interpretation and that there was no discrimination against Americans. As the evidence does not compel a contrary conclusion, we are bound by the trial court's finding.

2. *Immediate Payment*

Section 259 of the Probate Code states that the rights of aliens not residing here to take by succession or testamentary disposition depend (1) upon reciprocal rights of United States residents to take in the country of which the alien is an inhabitant, and (2) upon the rights of our citizens "to receive by payment to them" here. Appellant contends that this means a right to *immediate* payment. The evidence shows that both the United States and Germany suspended payments to the nationals of the other during the war. Even before the war, on June 14, 1941, the United States prohibited transfers of credit between banking institutions in the United States and those in other countries except under Treasury license. After the war between the United States and Germany started, the Trading With the Enemy Act forbade the payment of American inheritances to Germany or the receipt by Americans of German inheritances. On December 12, 1938, Germany adopted the Law Concerning the Management of Foreign Currency, which required a license to pay claims of a foreigner against a German. Germany on April 9, 1942, extended the

Treatment of Enemy Property Act of January 15, 1940, to the United States, thereby prohibiting the payment of any money to our nationals.

While the portion of section 259 dealing with payment does not use the word "reciprocal" as it does in the prior portion of the section, it is clear that the right to receive payment by our citizens referred to a reciprocal right of citizens of a foreign country to receive payment here. Thus, during the war, there was no reciprocal right of a German to receive payment of an inheritance from an American any more than there was such a right for an American to receive payment of an inheritance from a German. The right to immediate payment was suspended by both countries. Again, prior to the war, both countries required the obtaining of a license before money could be transferred from the one country to the other. Dr. von Lewinski testified that he had never heard of this license being denied an American before the war. That reciprocal right to payment under section 259 did not apply to wartime suspension of payments by the respective countries under their particular Trading With the Enemy Acts is shown by *Estate of Blak*, 65 Cal.App.2d 232 [150 P.2d 567]. There the question was whether in 1942 reciprocity under section 259 was accorded citizens and residents of the United States by the Netherlands, in spite of the fact that that country was then under occupation by the Germans. In holding that such reciprocity existed, the court also considered the same contention made by appellant here—that the conditions of section 259 were not met because immediate payment could not be made. As to this, the court said (p. 239): " 'It will also be observed that the Legislature did not say *when* United States citizens were to receive payment. It used the words "the rights" to receive. The Legislature therefore necessarily contemplated and had in mind that the availability of the proceeds of such foreign estates for immediate distribution and payment to United States citizens would be controlled by the exigencies of the battlefield. It placed no time or other limitation as to when payment was to be made. It was concerned only with the existence of "rights" accorded to United States citizens by and under the legally constituted and recognized laws and government of the country of which the alien was a citizen and resident, to receive their inheritance, knowing that such rights persist and carry on in the scheme and order of society in spite of the immediate fluctuations of

war, and that, at most, the remedies for the enforcement of the right may be temporarily suspended.' ''

Appellant attempts to distinguish the *Estate of Blak* decision from the situation in the instant case by pointing out that although the Netherlands was under German occupation its citizens were still Netherlands nationals, and although for certain purposes, because of its occupation by the enemy, it must be considered enemy territory, its territory was recognized by the United States as belonging to the Netherlands, one of our allies. However, the portion of section 259 dealing with payment does not make a distinction between enemy and nonenemy countries. It holds that there must be a reciprocal right to payment, but does not require immediate payment, nor payment during a period when both our country and the other country involved have suspended payments for an emergency period.

Appellant contends that respondent has not sustained the burden cast upon him by section 259.1 to establish the fact of the existence of reciprocal rights. The testimony of Dr. von Lewinski, plus the volume of documents showing the action of the German courts, was sufficient to meet that burden.

### 4. *Evidence*

Appellant contends that the 58 Certificates of Inheritance, the 25 Internal Revenue Reports made by private citizens in control of property belonging to absentees, and 11 files relating to administrative action on applications for foreign exchange, were not admissible in evidence; that the proper way to prove foreign law is to introduce the law itself, and foreign law may not be proved by circumstantial evidence; that the documents were not relevant in any event, as they did not show the existence of a right of Americans to receive inheritances.

The German laws introduced in evidence did not show any discrimination against Americans as to inheritance or testamentary disposition. If it were merely a question of the existence of a foreign statute, the introduction of the particular law would meet the situation. But there must in addition be a consideration of the effect of the law and its application. This, being a question of fact, can be determined only by the admission of any facts showing the effect and the application. See *Estate of Schluttig, supra* (36 Cal.2d 416), where the court said, referring to these very issues: ''Upon these subjects, the superior court heard highly conflicting testimony by experts upon the laws of those countries and their applica-

tion under given circumstances." (P. 424.) See, also, *Estate of Reihs*, 102 Cal.App.2d 260 [227 P.2d 564]. So, such issue may be proved in the same manner as any other issue of fact. Obviously, then, circumstantial evidence is admissible in this type of case. Actually, how better can the effect and application of the law be proved than by showing what the German probate courts and persons charged with administering property of foreigners did under it? The documents were relevant. The fact that some of them referred to inheritances due others than Americans did not affect their admissibility, but may have affected their weight, although they tended to show that there was no discrimination against any foreigner.

Appellant relies on the diplomatic correspondence for its contention that there was no reciprocity in the transfer of inheritance money. Again, here, there were circumstances upon which the court might have found favorably to appellant, but such conclusion is not compelled.

Appellant attacks the evidentiary value of the Certificates of Inheritance, the declarations as to property of absentee owners, and the foreign exchange licenses, on various grounds. While some of them probably are irrelevant, some remote, and some were after the Allied Occupation, the bulk of them, under Dr. von Lewinski's testimony, were significant.

### 3. *Estate of Schluttig*

During the appeal in our case the *Estate of Schluttig* was decided. At oral argument, appellant asked permission to produce as additional evidence the entire record in the Schluttig case, in order that it might plead it as res judicata. In the Schluttig case the trial court found that on April 3, 1945, reciprocity as to rights of inheritance did not exist between citizens of this country and those of Germany or Austria. In that case the United States Attorney General claimed the interests of the alien heirs. Obviously, those heirs, and, in fact, all of the parties to the proceeding other than the Attorney General, were different from the parties to this proceeding. Appellant contends that as the United States Attorney General is a party to both proceedings, the Schluttig decision is res judicata as to him, basing such contention primarily on *Bernhard* v. *Bank of America*, 19 Cal.2d 807 [122 P.2d 892]. There the decedent in her lifetime had instructed her agent, Cook, to deposit certain moneys in the bank in her name. Before she died, Cook withdrew these funds and deposited them in his own account. After her

death he qualified as her executor. He filed an account accompanied by his resignation, omitting any mention of these funds. The legatees objected to the failure to include these funds as assets of the estate. Upon the hearing, the court settled the account as presented, and as part of its order declared that the decedent during her lifetime had made a gift to Cook of the moneys in question. Thereafter one of the objecting legatees was appointed administrator with the will annexed. As such she sued the Bank of America, in which the moneys had originally been deposited, seeking to recover the moneys on the ground that the bank was liable for them as the decedent had never authorized the withdrawal. Among other defenses, the bank pleaded that the finding of the court that the decedent had made a gift of these moneys to Cook was res judicata. Plaintiff contended that the doctrine did not apply because the defendant asserting the plea was not a party to the previous action, nor in privity with a party thereto, and because there was no mutuality of estoppel. The Supreme Court upheld the action of the trial court in applying the doctrine. After reviewing the doctrine at some length, the decision points out that generally the plea of res judicata is available only when there is privity and mutuality of estoppel; also that "The criteria for determining who may assert a plea of res judicata differ fundamentally from the criteria for determining against whom a plea of res judicata may be asserted. The requirements of due process of law forbid the assertion of a plea of res judicata against a party unless he was bound by the earlier litigation in which the matter was decided. [Citations.] He is bound by that litigation only if he has been a party thereto or in privity with a party thereto. (*Ibid.*) There is no compelling reason, however, for requiring that the party asserting the plea of res judicata must have been a party, or in privity with a party, to the earlier litigation." (Pp. 811-812.) It then goes on to show that "Many courts have abandoned the requirement of mutuality and confined the requirement of privity to the party against whom the plea of res judicata is asserted" (p. 812) and then holds that the issue as to ownership of the money is identical with the issue in the probate proceeding; that the order of the probate court was a final adjudication of this issue on the merits. In determining whether the plaintiff was a party or in privity with a party to the earlier proceeding, it pointed out that plaintiff was suing in the capacity of administratrix of the estate, and

thereby represented the same persons and interests that were represented in the earlier hearing. In that hearing plaintiff and the other objecting legatees represented the estate of the decedent, as they were seeking not a personal recovery but, like the plaintiff in the present action, as administrator, a recovery for the benefit of the legatees and creditors of the estate, all of whom were bound by the order settling the account. ''The plea of res judicata is therefore available against plaintiff as a party to the former proceeding, despite her formal change of capacity. 'Where a party though appearing in two suits in different capacities is in fact litigating the same right, the judgment in one estops him in the other.' '' (P. 814.) An analysis of the Bernhard case shows that while it uses broad language which might indicate that the requirement of mutuality had been completely abandoned in res judicata cases, it is only in cases where there is a real privity to the party against whom the plea is asserted that it actually is not required. Thus, it gives as examples of derivative liability master and servant, principal and agent, indemnitor and indemnitee situations. Moreover, its ruling is that in the two proceedings there involved, it was the estate represented at the hearing by the objecting legatees and at the trial by the administratrix, which was the real party in interest and hence bound by the first order.

The Bernhard case lays down three rules to determine the application of res judicata: (1) Was there a final judgment on the merits? (2) Was the party against whom the plea is asserted a party in privity with a party to the prior adjudication? (3) Was the issue decided in the prior adjudication identical with the one presented in the action in question? Applying these rules, we find that at most, only two of them are met by the instant situation. The Schluttig decision was a final judgment on the merits, and we will assume (without deciding) that lack of mutuality can be extended to situations other than those of master and servant, principal and agent, indemnitor and indemnitee, or persons representing the same estate, and that therefore the requirement of privity is met. It is doubtful if the rule of the Bernhard case should be given such a sweeping application. ''. . . it is a familiar rule that expressions used in judicial opinions are always to be construed and limited by reference to the matters under consideration, and that they cannot be safely applied in their largest and most universal sense to dissimilar cases.'' (*City of Pasadena* v. *Stimson,* 91 Cal. 238, 250 [27 P. 604].) But

when we come to the third rule, we find very definitely that the issue decided in the Schluttig case is not identical with the one presented here. In that case the court was considering and found upon the fact of German law effect and application on April 3, 1945, while the important date in our case is April 22, 1942, practically three years earlier in the war. While in the Schluttig case, as in ours, evidence was introduced covering the whole period of the war, the finding that a certain condition existed in 1945 was not a finding that that condition existed either before or after that year (see *Estate of Reihs, supra*, 102 Cal.App.2d 260), for finding that on November 24, 1946, reciprocity actually existed). Section 1911 of the Code of Civil Procedure provides: ''That only is deemed to have been adjudged in a former judgment which appears on its face to have been so adjudged, or which was actually and necessarily included therein or necessary thereto.'' The situation in 1942 was neither actually nor necessarily included in the finding of the situation in 1945. ''. . . it is not enough that the proposed evidence tends to show that the precise question may have been involved in such litigation. It must clearly appear that it was directly involved and adjudicated.'' (*Emerson* v. *Yosemite Gold Min. etc. Co.*, 149 Cal. 50, 57 [85 P. 122].)

Appellant contends that the evidence in the Schluttig and our case is essentially the same. In its brief it compares the evidence in the two cases. In order to get very much similarity in that comparison it includes the evidence given before the District Court of Appeal which the Supreme Court held was improperly admitted and which it refused to consider. Much of that evidence was before the trial court in our case, although not before the trial court in the Schluttig case. For example, Dr. von Lewinski was not a witness at the trial of that case. Nor were ''certificates of inheritance issued by German courts having probate jurisdiction during the period August, 1937, to August, 1945, . . . 37 decrees or orders, issued from 1940 to 1944, appointing curators for beneficiaries of German estates residing in the United States, copies of some foreign statutes and case files of German probate courts which show the procedural steps taken in the administration of certain estates.'' (*Estate of Schluttig, supra*, p. 420.) Most of this evidence appears in our case. It is highly significant that in *In re Schluttig's Estate*, *(Cal.App.) 218 P.2d

*A hearing in the Supreme Court was granted on July 20, 1950, and the final opinion is reported in 36 Cal.2d 416 [224 P.2d 695].

819 (taken over by the Supreme Court) the District Court of Appeal, after it had considered the additional evidence above mentioned, produced by the United States Attorney General, felt that a new trial must be granted. In referring to this evidence the Supreme Court said (p. 420): ''In summary, said the district court of appeal, it creates a conflict with the evidence produced at the trial and presents questions of credibility of witnesses which an appellate court is not in a position to determine.'' Moreover, several of the legal documents used in the instant case were issued *after* April 22, 1942. Again three of the four commentaries relied upon by appellant and concerning which in the Schluttig case it was said (p. 425), ''Comments upon German law, shown to have been relied upon in the probate courts of that country, cited as examples of legacies which would be void . . .'' were not published until 1944. Even were we to examine the record in the Schluttig case, we would have to guess in order to determine whether the trial court in the Schluttig case in making its finding of the situation in 1945 was also necessarily determining the situation in 1942. This we cannot do. It was not a question there decided. '' 'Every estoppel must be certain to every intent, and not to be taken by argument or inference.' (Coke on Littleton, 352b.) 'If upon the face of a record anything is left to conjecture as to what was necessarily involved and decided, there is no estoppel in it when pleaded, and nothing conclusive in it when offered in evidence.' '' (*Beronio* v. *Ventura County Lumber Co.*, 129 Cal. 232, 236 [61 P. 958, 79 Am.St.Rep. 118].)

We realize that it is unfortunate that a rule of res judicata or some other rule which might put at rest the determination of the facts as to inheritance reciprocity during the Nazi regime, cannot be applied here. The effect of the decision in the Schluttig case, considered, as it was without regard to the pendency of other somewhat similar cases, is that inheritance of German nationals in California estates during the Nazi regime is, as a practical matter, to be determined as each case arises and then is dependent upon which set of experts the trial court may believe. On the other hand, were such a rule to be attempted, it would be manifestly unfair to select the Schluttig case as the determining factor for the reason that the evidence before the trial court there did not give a full and complete picture of the situation. Had the evidence introduced in the District Court of Appeal been before the

trial court, its ruling on the facts would have been a far fairer criterion of what the actual facts are. We now have three cases on the general subject: (1) *Estate of Schluttig,* which held that reciprocity did not exist as of April 3, 1945; (2) our case which holds that it did exist as of April 22, 1942; and (3) *Estate of Reihs,* which held that it did exist as of November 24, 1946. Undoubtedly there are other decisions in the offing.

The record in the Schluttig case is inadmissible for the reason that the issue there was not identical with the issue here, nor was it determined by the court there.

### FAILURE TO FIND

Appellant contends that the court should have made certain findings of fact set forth in "Petitioner's Objections and Proposed Amendment to the Objector's Proposed Findings of Fact and Conclusion of Law." It is not necessary to consider these proposed findings other than to say that, in effect, they are the opposite of the findings the court made. Thus, if the court had accepted appellant's theory of the evidence, these would have been proper findings, but as it adopted respondent's theory, it would have been improper to have made the directly contrary findings proposed by appellant.

The application for leave to produce additional evidence on appeal is denied. The judgment and decree is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 28, 1951.