[Civ. No. 14898. First Dist., Div. One. Sept. 26, 1951.]

Estate of MARY B. KENNEDY, Deceased. STATE OF CALIFORNIA, Appellant, v. THE AMERICAN TRUST COMPANY, as Executor, etc., et al., Respondents.

Edmund G. Brown, Attorney General, W. R. Augustine and William J. Power, Deputy Attorneys General, for Appellant.

E. Walter Lynch for Respondents.

WOOD (Fred B.), J.—Upon this appeal by the State of California, intervener, from a judgment distributing to the attorney in fact of Vasile Presecan, a resident and citizen of Romania, certain described real and personal property, and all undiscovered property, of the estate of decedent, the

question is: Does the evidence support the finding that "under the Romanian laws in effect at the time of the death" of the decedent, March 15, 1949, "citizens and residents of the United States had the right to receive real and personal property originating from the estates of persons dying in Romania on the same terms and conditions as citizens and residents of Romania, and that reciprocity as defined in Section 259 of the Probate Code of California existed under the laws of Romania?"

Dr. Desire Ratonitz, who qualified as an expert on Romanian law, expressed the opinion that according to the Romanian statutory law, according to the Romanian civic laws, there is full reciprocity as defined by section 259 of the Probate Code of California; that an American heir will take real or personal property under the same terms and conditions as a Romanian citizen could take; that the Romanian Civil Code does not differentiate between a foreign heir and a Romanian heir,—there is no discrimination.

He based his opinion in part upon certain portions of the Romanian Civil Code, as promulgated in 1864 with all amendments enacted until July 1, 1943, in evidence both in the Romanian and in the English languages. That portion of the code deals with descent and succession, and contains no provision discriminatory of aliens. He based his opinion also upon the Constitution of communistic Romania, testifying that article 8 of title 2 of the Constitution of April 13, 1948, declares that "Private Property and the right of inheritance are acknowledged and guaranteed by law."

So far as the witness could ascertain, there was no change from 1942 to March 15, 1949, concerning the rules of the law of succession as contained in the Romanian Civil Code. He did not know if any laws relative to this matter had been passed since the Constitution of 1948. He said there was no possibility of ascertaining in any kind of universal law collection or of calling on any magazine to check on that question. He did know that certain decree laws enacted during the German occupation, which discriminated against Jews and prohibited an alien from holding agricultural land acquired by succession (required him to sell the land and allowed him to take the proceeds of the sale) were abolished after the war was over. Those decree laws are not in effect any more. As to whether a Catholic might inherit property in Romania, he knew of no discriminating provisions. He did not know, had not heard, of any case of an American who

inherited anything from Romania since the war or had any benefit of it.

Romania, Dr. Ratonitz said, is one of the few countries which does not have with the United States a so-called Treaty of Friendship, which usually contains provisions pertaining to succession to real estate.

How far the statute laws are actually applied in Romania, the witness tried very hard to find out. Of how the law was working, he did not know. He had no information as to its actual operation as to any particular state.

He knew that Romania has exchange regulations but did not know the details of them, nor whether an American inheriting money there could bring it over here.

In his opinion there is no doubt that Romania is a communistic country and is under Russian domination, not a democratic country. He did not know about the program of nationalization in Romania.

Appellant introduced in evidence the text of a law of Romania, adopted in 1948, which provides for the nationalization of all resources of the subsoil which were not in the ownership of the state on the effective date of the Constitution of 1948, and 77 categories of industrial, banking, insurance, mining, transportation and telecommunication enterprises. It does not purport to nationalize any property, real or personal, except such property as is included in the assets of an enterprise which is nationalized. It provides for compensation to the owners and shareowners of each nationalized enterprise out of a state fund created for the purpose, compensation to be in the form of bonds, redeemable from the profits of the nationalized enterprise. Compensation to former owners is to be established by commissions operating with the courts, composed of three judges appointed by the Ministry of Justice. Their decisions are final, there being no hearing or appeal.

Appellant claims that respondent has failed to meet the burden of proving the existence of reciprocal rights of inheritance in Romania on March 15, 1949, because (1) the evidence concerning the applicable provisions of the Romanian Civil Code speaks as of July 1, 1943, and the confirmatory provisions of the Constitution speak as of April 13, 1948; (2) there is no evidence that the applicable provisions of the Romanian Code and Constitution are observed and carried out by the judicial and other appropriate officials of the Romanian government; and (3) the Nationalization Law

of 1948 leaves in private ownership properties so inconsequential in character as to render insubstantial, and hence nonreciprocal, any rights of inheritance.

■ (1) *As to the gap between 1943 or 1948 and March 15, 1949,* a presumption serves to supply the proof. This presumption finds statutory expression in subdivision 32 of section 1963 of the Code of Civil Procedure, which lists among disputable presumptions the presumption "That a thing once proved to exist continues as long as is usual with things of that nature." This presumption applies to the statute of a sister state; once proven to have existed it will be assumed to remain in force, in the absence of evidence showing its repeal. (*State* v. *Merger Mines Corporation* (1940), 3 Wn.2d 417 [101 P.2d 308, 310], involving an Arizona statute of 1935; *McGee* v. *Stark* (Tex.Civ.App., 1939), 127 S.W.2d 589, involving a Louisiana statute of 1882; *Walker Motor Exchange* v. *Lindberg* (1930), 86 Mont. 513 [284 P. 270, 272], involving an Oklahoma statute of 1921.) ■ This presumption applies also to the law of a foreign state (*In re Huss* (1891), 126 N.Y. 537 [27 N.E. 784, 12 L.R.A. 620], concerning a statute of the Grand Duchy of Baden, proven by means of an official publication of 1832.) " 'A fact of a peculiar nature, to which the presumption against change is held to apply, is the existence of a rule of foreign law.' " (*Zarate* v. *Villareal* (Tex.Civ.App., 1913), 155 S.W. 328, at p. 337.)

■ In support of its claim that this presumption does not apply here, appellant invokes the principle of law that judicial notice may be taken of historical facts, including the fact that Romania was for a time under the domination of Hitlerite Germany and later became a communistic state. Appellant argues that those governmental changes remove the foundation for the presumption; i.e., that such governmental changes are inconsistent with any concept of continuity in the laws of inheritance of that country. We do not perceive the logic of that argument. The *evidence* shows that the Romanian statutes accorded reciprocity as late as 1943; that discriminatory decrees promulgated during the German occupation have been repealed; and that the new Constitution of 1948 confirms the rights of inheritance. That brings it down to less than a year from the critical date. What basis would this court have for ruling out the presumption of continuity during that year? Appellant asserts that "The violent change in the form of the Roumanian Government" in April of 1948, when the Communist Constitution was

adopted, furnishes such a basis. ▆ That, in effect, is to say that this court should take judicial notice of an asserted probability that Romania upon becoming a communistic state would change her law of inheritance to discriminate against citizens and residents of the United States. We do not see in the mere change of the form of government ground for invoking judicial notice of a probability that the "right of inheritance" which the new Constitution has guaranteed will be soon changed; that, too, in the face of our statutorily declared and judicially confirmed presumption of continuity. There is no greater reason or sounder basis for taking judicial notice of such a probability than there is for taking judicial notice of Romania's legislative enactments. ▆ The latter we cannot do, even though we may take judicial notice of the communist character of the Romanian government. Thus, in *Banco de Sonora* v. *Bankers' Mutual Casualty Co.* (Iowa, 1903), 95 N.W. 232, one of the questions at issue was whether or not a certain person, at a certain time, was an adult under Mexican law. That had to be proven as a fact, even though the court might take judicial notice that the civil law was the foundation of Mexican jurisprudence. Said the court (at pp. 235-236): "As to whether the civil law is the foundation of Mexican jurisprudence, the histories are quite as accessible to the court as to the witness. Probably judicial notice should be taken of the fact as a matter of history. But this extends no farther than that the general system of civil jurisprudence prevails, without taking notice of details. The extent of its adoption we are not bound to know, for, in its adjustment to the situation and conditions of a people on this continent, doubtless many changes were made. Was the entire body of the Justinian Code adopted? Or this with modifications essential to meet the necessities and demands of modern civilization? This was a matter for specific proof with respect to the particular issue." A similar distinction was drawn in *Barrielle* v. *Bettman*, 199 F. 838. "A court may take judicial notice of the historical fact that the civil law is the foundation of French jurisprudence, but not of its details. 5 Ency. Ev. 808, note. Nor is it bound to know the extent of its adoption, or its modifications, if any, to meet the necessities and demands of modern civilization or the changes in the form of government which have taken place in that country." (P. 840.) Likewise, here, judicial notice, or evidence, that on March 15, 1949, Romania was a communistic state, though it supplies some

information concerning the form of government of that nation, gives us knowledge of none of the "details" of the jurisprudence of that country, particularly as concerns discriminatory or nondiscriminatory laws of inheritance.

 Accordingly, the presumption of continuity applies to the evidence in this case. That presumption was not controverted by evidence offered by either party. The trier of the facts was "bound to find according to the presumption" (Code Civ. Proc., § 1961). Even if appellant had introduced some controverting evidence, the presumption would have remained in the case, for consideration and weighing by the trier of the facts. As stated in *Westberg* v. *Willde*, 14 Cal.2d 360, at 365 [94 P.2d 590], "the rule is firmly established in this state that a presumption is evidence and is sufficient to support a verdict of a jury or a finding of the court, unless overcome by satisfactory evidence." This is quite different from the situation in *Estate of Knutzen*, 31 Cal.2d 573, 579 [191 P.2d 747], where, in the absence of proof of the foreign law, a party ineffectively invoked the presumption that the foreign law was the same as the California law. Such a presumption could not obtain in the face of the requirement of section 259.1 of the Probate Code that the nonresident alien "establish the fact" of the existence of reciprocal rights. In the instant case, the alien's representative "established the fact" of the existence of such rights in 1943 and 1948. That *fact*, in the absence of controverting evidence, is presumed to have continued to exist until March 15, 1949.

(2) *That the Romanian law of inheritance was being observed and carried out on May 15, 1949,* by the judicial and other appropriate officials of the Romanian government, is presumed, in the absence of controverting evidence. The presumptions "That official duty has been regularly performed," and "That the law has been obeyed" (Code Civ. Proc., § 1963, subds. 15, 33) are applicable to the provisions of a foreign law. A grant or concession made by a foreign government or its officers creates a legal presumption that the acts of such agents are within the sphere of their duties until the contrary appears. (*Payne & Dewey* v. *Treadwell*, 16 Cal. 220, 227.) Concerning the genuineness of documents and records, and signatures thereon, kept by Mexican officials prior to cession of the territorial area of this state to the United States, the court, in *Sill* v. *Reese*, 47 Cal. 294, at page 344, said: "These documents and records have

remained continuously in official custody, and although it is not impossible that in some instances forged papers have been surreptitiously or corruptly placed among them, the presumption that officers have done their duty in preventing such frauds, applies equally to the public functionaries of Mexico, and to those of our own Government.'' In respect to a certain conciliation proceeding and the judgment rendered therein, and grants of land made pursuant thereto by officials of the Government of Mexico in 1833, our court, in *De Castro* v. *Fellom,* 135 Cal. 225 [67 P. 142], said: ''. . . the presumption is in favor of the power of the governor and of the departmental assembly to make the grants. Nor does it appear they acted in any way irregularly (Code Civ. Proc., sec. 1963, subd. 15), and the contrary—especially in view of the confirmation of the grants—is to be presumed.'' (P. 231.) In *The Amelia* (1801), 1 Cranch (5 U.S.) 1 [2 L.Ed. 15], one of the parties contended that a certain French decree of January 18, 1798, which declared as good prize any neutral ship found at sea carrying merchandise produced in England or her possessions, might have been merely *in terrorem* and might never have been executed, and that such a provision being in opposition to the law of nations the court ought to presume it never would have been executed. In overruling this contention, Chief Justice Marshall said: ''But the court cannot presume the laws of any country to have been enacted *in terrorem*; nor that they will be disregarded by its judicial authority. Their obligation on their own courts must be considered as complete; and without resorting either to public notoriety, or the declarations of our own laws on the subject, the decisions of the French courts must be admitted to have conformed to the rules prescribed by their government.'' (P. 40.)

Likewise, in the instant case, evidence that the Romanian law accorded reciprocal rights of inheritance to citizens of the United States on March 15, 1949, gave rise under our statute to presumptions that that law was being obeyed and that the judicial and other appropriate officials of Romania regularly performed their duty of observing and carrying out the provisions of that law.

This conclusion is not inconsistent with the decisions in *Estate of Schluttig,* 36 Cal.2d 416 [224 P.2d 695], and *Estate of Miller,* 104 Cal.App.2d 1 [230 P.2d 667]. In each of those cases there was in evidence a German law which could have been interpreted by the German courts as meaning

that inheritance by nonresident aliens did not exist as a matter of right but was subject to the arbitrary discretion of Nazi administrators acting in accordance with Nazi ideology. In each of those cases there was conflicting evidence concerning the interpretation of that law by the German courts, and the determination of the trial court thereon was sustained as a finding of fact upon conflicting evidence. In the instant case the Romanian laws in evidence are not ambiguous. In the absence of controverting evidence, the presumption supplies the fact that the Romanian laws are observed and obeyed.

(3) *The Romanian Nationalization Act of 1948,* in evidence, does not directly controvert any of the presumptions which we have discussed. It does not bear directly upon the law of wills or of descent and succession. It does withdraw from private ownership the resources of the subsoil and certain business enterprises. It leaves in private ownership, hence inheritable, property of every kind (other than the subsoil) not devoted to such an enterprise. Illustrative of this point is the fact that none of the properties involved herein, except resources of the subsoil, if any, would be nationalized by this statute, if located in Romania. It is not necessary to consider what the effect under our section 259 might be if Romania were to nationalize every conceivable kind of property. Short of such a measure of nationalization, it is not reasonable to ascribe to our Legislature an intent to deny the right of inheritance to a nonresident alien merely because his government has embarked upon a program of socialization of industry. It is common knowledge that there is scarcely a government in Europe that has not embarked upon a program of socialization of industry in greater or less degree. The pivotally important point in the instant case is that the Romanian Nationalization Law does not alter the law of inheritance of that country in respect to property, real or personal, which it leaves in private ownership. That law, therefore, does not render untenable, or unsupported by sufficient evidence, the trial court's finding that reciprocity as defined in section 259 of our Probate Code existed on March 15, 1949.

The judgment appealed from is affirmed.

Peters, P. J., and Bray, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 19, 1951. Edmonds, J., and Schauer, J., voted for a hearing.