[Civ. No. 4860.   Fourth Dist.   Sept. 27, 1954.]

Estate of RICHARD LEEFERS, Deceased.   A. E. GAL-
LAGHER, as Public Administrator, etc., Petitioner, v.
HENRY LEEFERS, JR., Respondent; HERBERT
BROWNELL, JR., Attorney General of the United
States, as successor to the Alien Property Custodian,
Appellant.

Dallas S. Townsend, Assistant Attorney General of the United States, Laughlin E. Waters, United States Attorney for Southern District of California, Valentine C. Hammack, Special Assistant to the Attorney General of the United States, James D. Hill, George B. Searls and Max Wilfand, Attorneys, Department of Justice, Washington, D. C., for Appellant.

Clarence Harden for Respondent.

GRIFFIN, Acting P. J.—This is an appeal by the Attorney General of the United States, as successor to the Alien Property Custodian (Executive Order No. 9788, 11 Federal Regulations 11981) from a decree establishing interests in the decedent's estate under section 259 of the Probate Code.

Richard Leefers, a naturalized citizen and resident of the United States, died intestate in San Diego County, California, on January 15, 1944, leaving an estate consisting entirely of personal property, valued at approximately $11,000. He was never married. He left surviving him certain described heirs then living in, and citizens of Germany, and Henry Leefers, Jr. (described as American claimant) who, at all times here concerned, was and is a citizen of the United States and residing therein.

A petition to probate the estate by the public administrator was filed in San Diego County on January 17, 1944. On March 13, 1947, the American claimant, objector and respondent herein, filed his petition for an order to determine interests in the estate. Objection was made to distribution of any portion of the assets to the foreign heirs because, at the time of decedent's death, there did not exist any reciprocal right on the part of citizens of the United States to take personal property and money in Germany by succession or testamentary disposition upon the same terms and conditions as residents and citizens of Germany, and the American claimant asked that distribution of the entire estate be made to him under the provisions of sections 259, 259.1 and 259.2 of the Probate Code of California. The Attorney General, appearing as successor to the Alien Property Custodian, denied generally these allegations and alleged that such reciprocal rights defined by these code sections did then exist, and asked that distribution be made to him as such custodian. (On September 15, 1945, the Alien Property Custodian issued Vesting Order No. 4130, purporting to vest all right, title and interest of

the named foreign heirs described therein for the use and benefit of the United States.)

After several weeks of trial the learned trial judge rendered a 59-page written opinion setting forth these facts and fully discussed the evidence produced by the government in aid of its contention and the facts in evidence produced by the respondent which he claims support his claim to the estate.

The question here presented on this appeal is whether the evidence is sufficient to support the finding of the trial court and whether the ultimate conclusion and judgment that on January 15, 1944, the date of the death of the deceased, there existed no reciprocal right on the part of citizens of the United States to take personal property upon the *same terms and conditions* as residents and citizens of Germany, and whether the government had, on behalf of the foreign heirs, met the burden of proof cast upon it (Prob. Code, § 259.1) to show that such reciprocity existed.

Voluminous evidence was introduced through expert witnesses as to the German law relating to inheritance rights in effect at the time of decedent's death. It consisted of the text of German statutes and decrees, commentaries by German authorities upon such laws, expert testimony upon the meaning of the laws, and evidence as to the practical construction and application of the laws by German courts. Without setting it forth in detail, the issues before the trial court required a consideration not only of the existence of the foreign statutes but a finding as to their effect based upon the interpretation of them and their practical application by the German courts. The parties did not agree as to the correct interpretation of the statutes and each stressed uncertainties and ambiguities which require explanation. Moreover, it was shown that the right to inherit in foreign countries depended upon certain policies of the Nazi regime. Upon all these subjects both parties presented considerable testimony by experts. The government's testimony compared favorably with the evidence produced by it in *Estate of Miller,* 104 Cal.App.2d 1, at pages 4, 5, 6 and 7 [230 P.2d 667]. The government experts concluded as their opinion that with respect to the pertinent sections of the German Civil Code as to the right to inherit and succeed, no distinction was made between nationals of Germany and foreigners, including American citizens; that under the German law of inheritance any foreigner may succeed to an estate in Germany the same as a national in that country; that this right of inheritance remained intact through-

out the Nazi regime; and that no laws were enacted which in any way abrogated it.

In direct contradiction to this evidence there were certain qualifying laws and enactments or decrees received in evidence, extracts from certain textbooks and commentaries, as well as expert opinions to the effect that these decrees or laws offered by respondent herein made testamentary dispositions to certain classes or certain individuals invalid, particularly if they were contrary to what was termed by the National Socialist regime, the "Healthy National Sentiment," and that the German Civil Code was to be disregarded if the distribution of the estate was against "Healthy National Sentiment."

In support of the judgment the trial court found that as to certain extracts from German laws offered in evidence by the government, there was no conflict with the California law in reference to succession, and particularly enumerated those laws, including the Weimer Constitution of the German Reich, effective August 11, 1919, providing in part as follows:

"Article 154

"(1) The right to inherit is guaranteed in accordance with Civil Law.

"(2) The share of the estate in inheritance is determined by the laws . . ."

However, the court found that subsequent to these laws certain Nazi amendments were decreed, including one dated March 24, 1933, wherein the Reichstag enacted a law concerning the "Removal of the Distress of Nation and Reich," which provided generally that the laws of the Reich may deviate from the Reich Constitution to the extent to which "they do not have the institution of the Reichstag and the Reich Council as their object," and that the "rights of the Reich President remain untouched." These laws were made effective upon publication.

On July 31, 1938, under the Nazi regime, a law was enacted amending the provisions of the German Civil Code as follows: Section 48, Paragraph (1)

"A disposition for the event of death is void insofar as it is contrary to mandatory provisions of law.

"(2) — Any disposition for the event of death is void insofar as it is contrary — because of being grossly opposed to sound sentiment of the people — to consideration which a decedent, who is conscious of his duties, must have towards his family and the community of the people."

On July 14, 1933, a law was passed by the Reichstag, translated as:

"Sec. 2. Reich nationals who are abroad, may be declared deprived of their German nationality if they have damaged German interests by a behavior which is contrary to their duty of loyalty against the Reich and Nationa. The same applies to Reich nationals who do not obey an order to return which has been directed to them by the Reich Minister of the Interior under reference to this rule.

"  .  .  .  .  .  .  .  .  .  .  .  .  .

"The Reich Minister of the Interior, in agreement with the Reich Minister of Foreign affairs, decrees in each particular case the extent to which the loss of German nationality applies to spouses, to legitimate or legitimated children, and in the case of women, to illegitimate children."

Another enactment dated May 21, 1935, provides in article 18 thereof as follows:

"A German in the sense of this law is every Reich national although he possesses also a foreign nationality."

On November 5, 1937, the Reichstag enacted a law providing:

"Sec. 1. Exclusion of de-naturalized persons from taking by succession, inheritance, and gift.

"(1) A person who has been deprived of his German nationality by virtue of sec. 2 of the Law of July 14, 1933 (RGBI I p. 480), cannot take by succession or inheritance from a German national.

"(2) The same applies to the spouse and the children of the persons referred to in par. 1, to whom the loss of nationality extends according to Sec. 2, par. 4 of the law of July 14, 1933.

"(3) Gifts by German nationals to persons referred to in paragraphs (1) and (2) are prohibited. Anyone who makes or promises a gift contrary to this prohibition, is punishable with imprisonment up to two years and with a fine or with one or the other of these punishments."

There was issued on October 11, 1939, a decree deemed to have the effect of law, which is translated as follows: "Absentee Administration Decree," consisting of nine sections, the general purport of which was to require courts having probate jurisdiction to appoint administrators, under such directions and regulations as should be given and made by the Reich Minister of Justice, to take charge of the property of absent persons generally, but specifically upon "order from the higher administrative authority in the district where the

probate court is located," in the case of absent persons who were nationals of enemy countries, and manage the same as in effect trustees.

On November 11, 1941, there issued what appears to have been known as the "11th Decree for the Execution of the Reich Citizenship Law," which was translated as follows:

"Sec. 2. A Jew loses German nationality (a) with the coming into force of this Decree if he usually resides abroad at the time of the coming into force of this Decree; (b) with the transfer of his usual residence to a foreign country if he takes up his usual residence abroad at a later date.

"Sec. 3. The property of a Jew who loses the German nationality by force of this Decree, escheats to the Reich with the loss of his nationality. Also, the property of Jews who at the coming into force of this Decree are stateless and whose last nationality was German, escheats to the Reich if they have taken or take their usual residence abroad. . . .

"Sec. 4. Persons whose property has escheated to the Reich according to Sec. 3, may not acquire anything from a German national by cause of death.

"Gifts by German nationals to persons whose property is escheated to the Reich according to Sec. 3, are prohibited. A person who despite the prohibition, makes or promises a gift, shall be punished with imprisonment up to two years and with a fine or with one of these punishments."

As bearing upon the total collapse of judicial independence under the Nazi Government, there was placed in evidence a translation of a resolution of the Greater German Reichstag, dated April 26, 1942, as indicative of the power and control the Führer had over the courts and administration of the laws of Germany during the period here in question. It reads in part:

"There can be no doubt that the Führer must during the present time of war in which the German nation is engaged in a fight for life or death, have the right which has been assumed by him, to do everything that serves the achievement of victory or contributes thereto. The Fuhrer, therefore, must —without being bound by existing rules of law—, in his capacity as Führer of the Nation, as Supreme Commander of the Armed Forces, as Chief of the Government, and as supreme possessor of executive powers, as *supreme lord of the judiciary*, and as Führer of the Party, at any time be in a position to order, if necessary, any German—be he a common soldier or officer, low-class or high-class officer or *judge,* executive

or ministerial functionary of the Party, laborer or employer—with all means which he deems suitable, to fulfill his duties, and to visit him, in case of violation of these duties, after conscientious examination, with the punishment which is due to him, without regard to so-called vested rights, and to remove him from office, from his rank, and his position without the institution of prescribed procedures.'' (Italics ours.)

Subsequent to the death of the decedent herein, and on September 1, 1944, a modifying order of the Reich Minister of the Interior was issued, reading in part as follows:

''Sec. 1. The Thirteenth Decree for the Execution of the Reich Citizenship Law is not applicable to Jews of foreign nationality.''

On September 20, 1945, the Allied Control Council for Germany repealed all German laws discriminating against persons by reason of race, nationality, religious belief or opposition to the Nazi regime, as well as certain other described decrees.

The trial court, in summing up the government's evidence stated that the government illustrated the general practice of recognition, notwithstanding the existence of a state of war, of the validity of certain legacies by residents and nationals of Germany, of property located there, to American nationals living in this country. It was pointed out that these records, however, did not for the most part deal with heirs, devisees or legatees of the Jewish race, although some did, and that as a general practice such legacies were not confiscated but were held by trustees in favor of the foreigners.

It was then found that there was no evidence that section 48 of the law of July 31, 1938, in reference to the disposition of property in the event of death was void insofar as it was contrary to the mandatory provisions of law, had been applied against an American citizen because of race or creed, or because such disposition was ''thoroughly opposed to a healthy national sentiment'' of the people, but the court concluded that the language used in the decree or act was, however, vague enough to be susceptible of being so applied should public sentiment in Germany come to demand it or justify racial discrimination against either nationals or aliens in response to any public sentiment that might impel it.

Next it was found, as testified to by Dr. Stern, respondent's expert witness, that on the date of Leefer's death no independent courts existed in Germany, as illustrated by the resolution of Greater German Reichstag of April 26, 1942, describing Hitler as ''Supreme Lord of the Judiciary''; that it left no

independent power of the court to disregard the dictator's wishes, and his will was to be above all law.

In *Estate of Schluttig*, 36 Cal.2d 416, 425 [224 P.2d 695], it was said:

"Clearly, when it is shown that the taking of estates by testamentary disposition or succession is a matter of sufferance determinable in accordance with directions of the Nazi officials and their concepts of national sentiment, there is no 'reciprocal right' as that term is used in the Probate Code." (See also *Estate of Arbulich*, 41 Cal.2d 86, 92 [257 P.2d 433].)

The trial court cited Dr. Stern's opinion that under the German laws then existing, certain classes of naturalized citizens of the United States would be incapable of taking property in Germany by intestate succession or by will under the law of July 14, 1933, and the possibiltiy of extension of their disabilities to their spouses and children, and cites as authority for his opinion the law of November 5, 1937, forbidding persons so deprived of their German nationality to take by succession or inheritance from a German national. The court found in this connection that there was nothing to indicate, once an emigrant German national, even though an Aryan, had incurred a forfeiture of German citizenship, and become incapable of taking by inheritance or testamentary disposition from a German, under the provisions of these statutes, that his capacity to take by inheritance or testamentary disposition from a German would thereafter be recognized in the Reich, even though he should after such forfeiture be naturalized in the United States.

The court discussed the effect of the Eleventh and Thirteenth decrees in reference to Jews who were deprived of their German nationality because (a) as of the effective date of the decree they usually resided abroad; or (b) were about to take up their usual residence abroad at a later date, if they lost their citizenship under section 3 of the decree, their estates escheated to the Reich. It was pointed out that one whose property so escheated could not thereafter acquire anything from a German national by reason of death; that according to the Thirteenth decree "after the death of a Jew, his estate escheats to the Reich," subject to certain permitted adjustments; and that this decree left it to the Reich Minister of the Interior to "establish the extent to which this decree is applicable to Jews of foreign nationality." The court found that this "can hardly be called reciprocal," citing *Estate of Peters*, 110 Cal.App.2d 723 [244 P.2d 88].

Dr. Stern testified that in his opinion, under the laws then in existence, where a Jew leaves Germany, under the Eleventh Decree he loses his property rights and his right to inherit from a person in Germany, Jew or non-Jew; that if he later becomes an American citizen he then is an American citizen who cannot inherit in Germany. The government cited certain cases claimed to support the view that the anti-Jewish decrees did not prejudice American Jews. The court found that it was not established just how many American Jews may have suffered from the application of these decrees, but that in all events, whenever they suffered from the application of the fourth section of the Eleventh decree, in his view, an infringement of the reciprocity requirement necessarily resulted, and said:

"The acceptance of a foreigner as a citizen of this country necessarily clothes him from our standpoint with all the rights and privileges of our citizenship, and the denial to him by his former country of any right to reciprocal treatment possessed by American citizens generally must be here held just as much a violation of reciprocity as though he never had been a German."

The trial judge further stated that it was hardly conceivable to him, as a trial judge, "that there were not many cases where Jews who at or after its date resided or went abroad, incurred the escheats and forfeitures of their German property denounced by the decree, and, thereby, notwithstanding naturalization in the United States subsequent to the date of the decree, continued incapable of taking property by inheritance, devise or bequest from German nationals."

It is the government's position that on the basis of the court's finding as to the specific German inheritance laws involved here, which are not disputed, the court incorrectly and as a matter of law erred in concluding that at the date of decedent's death American citizens did not enjoy reciprocal rights of inheritance from Germany within the meaning of the California law. It does not dispute the findings made by the trial court as to the meaning of these German laws, but contends that these disinheritance laws, by their terms, applied only to German citizens and could not apply to those former Germans, Jew or non-Jew, who had become American citizens prior to the commission of the acts of expatriation set forth in the law of July 14, 1933, because the acquisition of American citizenship then would have automatically resulted in their loss of German citizenship and, not there-

after being subject to any German expatriating law, they necessarily could not lose their inheritance rights under the law of November 5, 1937; that these German disinheritance laws were not directed at Americans as such, and the fact that they *might* affect Americans "was but incidental to their general operation"; that they were obviously aimed at German citizens and a limited class of stateless persons, formerly German, who because of conduct while they were Germans lost their German citizenship and their right to inherit; and that these laws were simply part of Germany's program of ideological and racial warfare against those Germans considered unworthy of German citizenship under German standards. We believe the trial court sufficiently answered these contentions.

Where treaties or statute law alone are before the court, their construction may be a matter of law, but the question of how a foreign country has construed and applied such treaties or statutes is one of fact. A finding by the trial court on the issue of reciprocity with respect to the right of United States citizens to take property by succession or testamentary disposition in a foreign country will not be disturbed on appeal if there is sufficient evidence to sustain such finding. (*Estate of Arbulich,* 41 Cal.2d 86 [257 P.2d 433].)

In *Estate of Schluttig,* 36 Cal.2d 416 [224 P.2d 695], it was held that it is a question of fact whether United States citizens during the Nazi regime in Germany and Austria had the same right to inherit or take under a will as residents and citizens of such countries, where determination of such issue requires consideration not only of foreign statutes, but an interpretation of their effect based on translation and practical application by the foreign courts.

We conclude that the evidence presented to the trial court called for a determination of a factual question, and since there was sufficient evidence to support the findings, under well-recognized authorities, such findings cannot be disturbed on appeal. (*Estate of Arbulich, supra.*)

*Estate of Miller,* 104 Cal.App.2d 1 [230 P.2d 667], relied upon by the government, is distinguishable in this, that the trial court there found upon conflicting evidence, that American citizens enjoyed reciprocal rights with German citizens in respect to personal property inherited from German estates on the date there involved. In the instant case conflicting opinions of different experts were involved and

additional evidence as to the law that was in existence at the time was here presented and considered. In the Miller case it was said, at page 15: ". . . there were circumstances upon which the court might have found favorably to appellant, but such conclusion is not compelled." And in discussing the Schluttig case it was remarked at page 19:

"The effect of the decision in the Schluttig case . . . is that inheritance of German nationals in California estates during the Nazi regime is, as a practical matter, to be determined as each case arises and then is dependent upon which set of experts the trial court may believe."

As stated in *Estate of Arbulich, supra,* at page 88: "The question before us is not whether we, if we were viewing the evidence initially, should find that the greater weight seemed to favor appellant or. the respondent but is, rather, whether we can hold that as a matter of law the finding of the probate court is without substantial evidentiary support."

So, viewing the entire evidence, we have concluded that the trial court's findings cannot, for the reasons expressed, be reversed. Since the findings support the judgment it must be affirmed.

Judgment affirmed.

Mussell, J., concurred.