[Civ. No. 6485.    Fourth Dist.    Sept. 12, 1961.]

Estate of DAVID GOGABASHVELE, Deceased. THE STATE OF CALIFORNIA et al., Appellants, v. EDUARD KAPANADZE et al., Respondents.

Stanley Mosk, Attorney General, Bonnie Lee Martin, Deputy Attorney General, Laughlin E. Waters and Francis C. Whelan, United States Attorneys, Donald A. Fareed and Frederick M. Brosio, Jr., Assistant United States Attorneys, for Appellants.

Gostin & Katz and Irwin Gostin for Respondents.

Kenny, Morris & Ibanez, Robert W. Kenny, Mosk and Rudman, Edward Mosk and Val Linton as Amici Curiae on behalf of Respondents.

GRIFFIN, P. J.—The United States and State of California appeal from a judgment which would distribute an estate, appraised at approximately $68,000, to the Consul General of the Union of Soviet Socialist Republics as attorney in fact for citizens of the Soviet Union as sole heirs of this estate.

David Gogabashvele, the decedent herein, was a patient in the United States Naval Hospital, San Diego, California, at the time of his death on August 14, 1956. He was a veteran of the Armed Forces of the United States and for about six weeks prior to his death he had been cared for by the Veterans Administration in the Naval Hospital. On the day before his death, the decedent executed his last will and testament. By his will, he left his entire estate to his sister, Nadia

Kapanadze, a citizen and resident of the Soviet Union, as his sole heir. It provided that if she predecease him, then all his property should go to his next of kin. Unbeknownst to decedent, the sister died before he made his will.

The will was admitted to probate and the estate was appraised at $68,510.21, of which approximately $25,000 is realty and the balance of $43,510.21 is personal property largely in the form of savings accounts. Eduard Kapanadze and Elena Georgobiani, citizens and residents of the Soviet Union (Republic of Georgia), filed statements of interest, claiming that Nadia predeceased the testator; that they are the only children and heirs of Nadia and the only heirs of decedent and that they are entitled to the estate of the testator.

The United States filed a statement of interest, claiming all of the personal property of the estate as trustee for the General Post Fund. The United States contends that there are no reciprocal inheritance rights with the Soviet Union; that under the provisions of Probate Code, section 259, the Russian claimants are not entitled to receive the estate, and that the decedent died intestate. The United States claims that it is entitled to the personal property of the estate under the ''Care Contract Law'' (38 U.S.C.A. §§ 5220-5228; formerly 38 U.S.C.A. §§ 17 through 17j), in return for the hospital care and treatment decedent received from the Veterans Administration.

The State of California asserted a claim to all of the property of the estate, contending that there are no reciprocal rights of inheritance with the Soviet Union, that there are no known heirs entitled to take, and that under Probate Code, sections 259, 259.1 and 259.2, the entire estate should escheat to the state.

Since the trial court held that the Russian claimants were entitled to receive the entire estate, it did not decide the issue between the United States and California as to whether the United States is entitled to receive the personalty under the provisions of the Care Contract Law.

The only issue presented by this appeal is whether on August 14, 1956, there existed reciprocal rights upon the part of citizens and residents of the United States to take real and personal property by succession or testamentary disposition from estates in the Soviet Union on the same terms and conditions as citizens and residents of the Soviet

Union would be entitled to take such estates. This is the test imposed by Probate Code, section 259. The burden of establishing the existence of the reciprocal rights is upon the nonresident alien claimants. (Prob. Code, § 259.1.) ■ The term "reciprocal right," as that term is used in Probate Code, section 259, contemplates a taking of estates by testamentary disposition or succession as a legal right enforceable without exception in the courts of the alien's country; where such a taking is merely a matter of sufferance there is no "reciprocal right" within the meaning of the code section. (*Estate of Miller,* 104 Cal.App.2d 1, 12 [230 P.2d 667]; *Estate of Leefers,* 127 Cal.App.2d 550 [274 P.2d 239].) ■ This statute is constitutional. (*Clark* v. *Allen,* 331 U. S. 503 [67 S.Ct. 1431, 91 L.Ed. 1633, 170 A.L.R. 953].)

■ Thus, where the right of a citizen of the United States to receive a legacy from a foreign nation is conditioned upon obtaining the "approval" of an agency of the foreign government and the granting of permission to receive such a legacy is not regulated by objective standards but is left to the unbounded discretion of the governmental agency, there is no "reciprocal right" as that term is used in the Probate Code. (*Estate of Arbulich,* 41 Cal.2d 86, 91-92 [257 P.2d 433]; *Estate of Schluttig,* 36 Cal.2d 416 [224 P.2d 695].)

■ Although Probate Code, section 259, does not require that foreign countries have the same judicial system as ours, or even an independent judiciary, it does require that there be no discrimination shown in inheritance matters as between nationals of that country and citizens and residents of ours. (*Estate of Miller, supra,* 104 Cal.App.2d 1, 12.) ■ When used in relation to claims for probate and inheritances, the word "right" means a claim or interest that is enforceable by law. That is to say, a right is a legally enforceable claim. (*In re Krachler's Estate,* 199 Ore. 448 [263 P.2d 769].)

■ Since the amendment of Code of Civil Procedure, section 1875, in 1957, which amendment provided that this court may judicially notice the law of foreign countries, the substantial evidence rule does not apply to issues as to the meaning of foreign law presented on appeal. We are empowered to consider the applicable statutes, court decisions and constitutional provisions of foreign nations to determine their legal import without being limited by the findings of the trial court. (*Victor* v. *Sperry,* 163 Cal.App.2d 518 [329 P.2d 728]; Witkin, Evidence, § 46, pp. 61-62.)

## Experts Agree

Various documentary and testimonial forms of advice presented to the trial court have been made available to this court, and, in addition, this court has conducted exhaustive independent research. While ultimate conclusions of some of the authorities presented to the trial court were in conflict, there is on many vital points no real disagreement. For example, there is no disagreement that in the Soviet Union (at least as far as vested rights are concerned) "an alien not protected by international convention is practically without rights." (Freund, Soviet Civil Law, vol. I, p. 360.) It is also agreed that on August 14, 1956, there was no treaty or agreement between the Soviet Union and the United States establishing any reciprocal rights of citizens of either country to inherit. Respondents, in disagreement with their own expert, attempt to rely on the "Litvinoff Letters" as constituting such agreement or treaty. However, in *In re Bold's Estate,* 173 Misc. 545 [18 N.Y.S.2d 291], it was held that said "Letters" never reached such status. Our own examination of these "Letters" and their history convinces us that said ruling in the *Bold Estate* was correct. Furthermore, the history of the Soviet Union's subsequent repeated violations of the assurances made in these Letters clearly demonstrates that the Soviet Union never considered them binding. (*United States* v. *Hiss,* 185 F.2d 822; *In re Bold's Estate, supra.*)

## Governmental Structure of the Soviet Union

Before examining the Soviet constitutional and statutory provisions bearing on inheritance rights of aliens in the Soviet Union, we deem it advisable to describe briefly the governmental organization of the Soviet Union. Our discussion in this respect is based largely on the statements of Dr. Gsovski (since 1931 head of European Law Division, Law Library, Library of Congress, a former Russian lawyer, author of several books on Soviet law), who covered this subject extensively in his discussion of Soviet law, but it is also based on an examination of the provisions of the Soviet Constitution and certain Soviet statutes. The Soviet Union is a federal state, having a written constitution and consisting of a central federal government (U.S.S.R.) and 15 Soviet Socialist Republics (S.S.R.'s) of which the Georgian Republic is one. The S.S.R.'s autonomy exists largely in the administrative field, if at all, since their budgets and their legislation are

subject to approval of the central government. (Soviet Const., § 14, subsecs. [d] and [k].)

Internally, both the central and the S.S.R. governments are organized on the principle that there is no separation of powers. Thus, Vishinsky, one-time attorney general and later deputy minister of foreign affairs, commented on the 1936 constitution: "We do not have the separation of powers but the distribution of functions. . . . This has nothing in common with the Montesquieu doctrine." Similarly, Steklov, a spokesman for the government at the discussion concerning the first Soviet Constitution in 1918, wrote: ". . . While the bourgeois constitutions . . . make an artificial separation between the executive, the legislative and the judicial powers, we, in our Constitution attempted insofar as possible, to concentrate all these functions in one central organ . . ." (Gsovski and Grzybowski, Government, Law and Courts in the Soviet Union and Eastern Europe [hereinafter cited as "Gsovski"] [published in the U.S. by Frederick A. Praeger in 1960] vol. I, pp. 20, 23-24.)

The U.S.S.R. Constitution of 1936 describes the formal government of the Soviet Union and the relationship between the central government and the S.S.R.'s. The Supreme Soviet, a bicameral legislature consisting of a Union Council and a Council of Nationalities, each of which has approximately six or seven hundred members, is the "highest organ of State Power in the U.S.S.R." Despite this claim of supreme power stated in the constitution, it is an historic fact, of which this court may take judicial notice, that since before 1936 the voting in both houses of the Supreme Soviet upon the innumerable resolutions and statutes submitted to them for decision has always been unanimous, and furthermore there has never been a conflict between the resolutions of the two councils. The Supreme Soviet ordinarily meets twice a year for a few days' session, at which time it enacts legislation presented to it by the Council of Ministers and approves, *nunc pro tunc*, edicts and decrees submitted to it which have been previously enacted by the Presidium. Sessions have ranged from three to 12 days in length. Throughout World War II it did not convene at all. The sessions are convened and adjourned by the Presidium, a body also provided for in the constitution.

The Presidium normally has 30 to 40 members elected by the Supreme Soviet (usually for a four-year term) and functions when that body is not in session. The Presidium possesses executive, legislative and judicial powers. Its chairman is

considered to be the Chief of State and the Presidium has under the constitution been granted the power to approve treaties and receive foreign envoys. It also appoints or relieves cabinet ministers upon recommendation of the Chairman of the Council of Ministers. It alone possesses the power to interpret laws (Soviet Const., § 49, subsec. [b]), which power is seldom exercised. (Gsovski, vol. I, pp. 542-543.) The Presidium has the power to enact legislation in the form of decrees and has on occasion issued decrees which are in conflict with the Soviet Constitution. (Gsovski, vol. I, pp. 22-23; Gsovski, Soviet Civil Law [University of Michigan, 1949] [hereinafter cited as Soviet Civil Law], vol. I, p. 72.)

The most important agency of the formal government is the Council of Ministers, a quasi cabinet. Before 1946 it was known as the Council of People's Commissars. It is designated "the highest executive and dispositive agency of government power." (Soviet Const., § 64; Gsovski, vol. I, p. 23.) Most top Communist Party leaders hold positions in this council and its chairman is considered to be the executive head of state, a position comparable to that of prime minister. The Council of Ministers prepares legislation to be enacted by the Supreme Soviet and on its own authority enacts resolutions, rules and regulations which are binding throughout the Soviet Union. It has on occasion enacted rules and resolutions which conflict with the Soviet Constitution. (Gsovski, vol. I, pp. 22-23; Soviet Civil Law, vol. I, pp. 73-74.)

It might be surmised from the fact that both the Presidium and the Council of Ministers issue decrees conflicting with the constitution that the constitution is not the supreme law of the land. This is the case. The constitution provides that the Communist Party shall be "the directive body of all organizations and societies of toilers, both public and governmental." (Soviet Const., § 126.) Thus, the Communist Party has dominance over the government and all organizations within the country. The right to nominate candidates in all Soviet elections is reserved to organizations controlled by the Communist Party. (Gsovski, vol. I, p. 26.) In fact, supreme power in the government is exercised by the leaders of the Communist Party, which is itself organized on levels roughly comparable to those of the formal government. The formal leader of the Communist Party is the First Secretary and under his direction functions a Secretariat. There is a Presidium composed of what was formerly the Bureau of Or-

ganization (Orgburo) and the Political Bureau (Politburo). This is the true cabinet and some of its members also belong to the Council of Ministers. Provision is also made for an organization having a larger membership, called the Central Committee of the Communist Party, which convenes twice each year, and for a Communist Party Congress, an organization roughly comparable to the Supreme Soviet, which however meets less frequently, it not having met between 1938 and 1952. Normally, about 1,300 delegates attend each Party Congress. During the meetings, which usually last about a week, the programs and policies which have already been predetermined by the ruling clique are proclaimed and unanimously approved. The last Party Congress at which open debate occurred was held in 1927. See Current Soviet Policies III (Columbia University, 1960).

Control is exercised by the Communist Party through directives issued to governmental agencies and its party members who work in governmental agencies. The highest posts in the government are reserved for Communist Party members. (Gsovski, vol. I, pp. 38-39.) Usually, decisions of the top party officials are issued through the governmental agencies which function as enforcement agencies for these decisions. A Soviet treatise on legal and political theory, published in 1955, describes this relationship as follows:

"The activities of the soviet agencies of the State, in issuing acts establishing legal rules (norms of law), go on, as stated before, under the direction of the Communist Party of the Soviet Union. The soviet laws and other rule making acts issued on their basis are outlined in advance by the Party and turn its instructions into rules of law, into unshakable dictates of the Soviet government." (Gsovski, vol. I, p. 42.)

However, many important enactments are promulgated as joint resolutions of the Council of Ministers and the Central Committee of the Communist Party. (Gsovski, vol. I, pp. 36, 37.) Sometimes the Central Committee of the Communist Party issues resolutions which take effect on their own authority and are carried out without being enacted by any agency of the formal government. (Gsovski, vol. I, p. 37.)

Since the power to enact decrees and legislation resides at once in several governmental bodies and also in the Communist Party, many Soviet statutes conflict with each other. Thus, Krylenko, at one time Commissar for Justice and a famous public prosecutor, stated in 1933 that the Civil Code was 60 per cent inapplicable and this portion was then dead

law. (Soviet Civil Law, vol. I, p. 6.) A Soviet writer stated in a text on private law:

"Our civil legislation is not coordinated; it is scattered, and presents a huge bulk of material containing many obsolete statutes no longer applied in fact, but still not yet abrogated; it has many gaps, many conflicts between individual statutes, and many other shortcomings." (Soviet Civil Law, vol. I, p. 4.)

This plethora of obsolete statutes presents a curious problem of interpretation and according to Gsovski it has been solved in practice by according precedence to the most recent enactment regardless of whether it has been referred to as a law, a resolution, or any other term, or without paying any attention to the rank of the issuing authority in the governmental hierarchy. It is considered that the rank of the governmental agency issuing the law is irrelevant, since the real sovereign power lies outside the official government. (Gsovski, vol. I, p. 42.)

Nevertheless, section 26 of the Soviet Constitution provides that in the event of a discrepancy between the law of a Soviet constituent republic and a federal law, the federal law shall prevail. The difficulties of interpreting Soviet laws are greatly enhanced by the presence of secret laws, that is, laws enacted but not made public although referred to in other laws. The resolutions of the Supreme Soviet are always published, but the edicts of the Presidium are frequently withheld from publication. It has also happened that the resolutions of the Council of Ministers have not been published and a special collection of laws and decrees which used to contain these resolutions was not published between 1949 and 1957. Resolutions which are not published have a binding force from the moment they are received by the governmental offices to which they are communicated. Occasionally, the existence of a Soviet law remains unknown until the edict repealing it is published. (Gsovski, vol. I, pp. 44-46.) Since the publication of laws is a necessary prerequisite to determining the existence of the state of law on any point, the fact that the Soviets fail to publish many of their laws makes it impossible for any court not having a knowledge of the inner workings of the Soviet governmental and Communist hierarchy to determine what Soviet law is on any issue.

## The Courts of the Soviet Union

The courts of the Soviet Union constitute a single judicial system, the main features of which are established by the

Federal Judiciary Act which was enacted in 1938. The system consists of the Supreme Court of the U.S.S.R., which is the only federal court, and various trial and appellate courts on the state or republic level.

Under the Soviet framework of government, courts do not constitute an independent judicial system. The Minister of Justice may, on his own discretion, initiate the reopening of any case. (Gsovski, vol. I, p. 537.) The courts are required to carry out the policy of the Communist Party. (Gsovski, vol. I, p. 521.) Private parties may not appeal to the U.S.S.R. Supreme Court. This privilege is reserved to the court's president, to the U.S.S.R. attorney general, and their deputies. (Judicial Act 1938, §§ 15, 16, 64; Gsovski, vol. I, p. 534.) There is no systematic reporting of decisions. Courts sometimes issue directives in the nature of legislation on matters not involved in cases before them. (Gsovski, vol. I, pp. 542-543.) The Communist Party completely controls the selection and removal of judges. (Gsovski, vol. I, p. 521; Soviet Civil Law, vol. II, pp. 510-511.)

A statute enacted in 1957 provides that the plenary session of the U.S.S.R. Supreme Court shall submit to the Presidium *suggestions* on questions of the interpretation of the laws of the U.S.S.R. (Gsovski, vol. I, p. 546.) Thus, the U.S.S.R. Supreme Court is subordinated to an advisory capacity insofar as interpretation of the laws is concerned. The rule of stare decisis is not followed and decisions of appellate courts are not precedent in later cases. (Gsovski, vol. I, p. 545.)

It is difficult to equate section 112 of the Soviet Constitution with statements of Soviet legal texts on the status of Soviet courts. It provides: ''The judges shall be independent and subject only to law.'' The same statement is found in the Judiciary Act, section 6. The word ''law'' is not further defined in either of these enactments.

In a 1936 edition of a textbook on the Soviet judiciary, Vishinsky said:

''The soviet court is subject only to law. But this does not mean that the soviet court is outside politics, outside of the struggle to strengthen and render prosperous the Soviet regime . . . It means that the judges of the soviet court . . . carry out unswervingly the policy of the proletarian dictatorship as expressed in the statutes of the soviet State, and that they carry out this policy regardless of persons and regardless of any 'local influences.' '' (Soviet Civil Law, vol. I, pp. 250, 251.)

In a treatise on the Soviet judiciary, published in the Soviet Union in 1954, it is stated that a Soviet judge must carry out the "policy of the Communist Party and the Soviet Government." (Gsovski, vol. I, p. 521.)

Thus, the Soviet Minister of Justice, speaking to a convention of Soviet lawyers in 1947, said: "The judge must know how to conduct the court proceedings and how to write the judgment in a manner which shows with the utmost clarity the political significance of the case so that the defendant and those present in the courtroom see clearly the policy of the government in the court action." (Soviet Civil Law, vol. I, p. 255.)

The arbitrary nature of "Soviet legality," as applied by the U.S.S.R. Supreme Court, was illustrated by the Beria case, as reported in Gsovski, volume I, pages 579-582. Beria, former Minister of the Interior under Stalin, was sentenced to death after trial by a "special judicial session" of the U.S.S.R. Supreme Court upon charges investigated and preferred by the attorney general. No provision is made for such a special judicial session of the Supreme Court in the Soviet Judiciary Act of 1938 or other statutes, and the persons sitting as justices of the court during the trial, with one exception, were not members of the Supreme Court. The trial was completed and the death penalty was pronounced and executed on December 23, 1953. Since the trial was before the session of the Supreme Court, there was no appeal. The disregard of law exemplified by this trial shows that the slogan "socialist legality" has no meaning when it is in the interests of the ruling clique to disregard the Soviet Constitution and statutory enactments, and that Soviet courts cannot be relied on to prevent these rulers from arbitrarily disregarding Soviet laws. At a matter of fact, as long ago as 1935, 99.6 per cent of the judges of the higher courts were members of the Communist Party. (Soviet Civil Law, vol. I, p. 242.)

Both private parties and the government attorney may appeal a case to the Supreme Court of a constituent republic. The appeal of the government attorney is technically called a "protest" and only he may appeal to the U.S.S.R. Supreme Court. In addition to the regular appeal-protest procedure, the U.S.S.R. Attorney General, certain other government attorneys, and the presidents of the higher courts may move for a reopening and ex officio review of a finally decided case in a lower court. No time limit is imposed upon the presenta-

tion of such motions and such ex officio review is not limited to situations involving newly discovered evidence. One of the grounds for ex officio review is "a particularly essential violation of the laws in force or a plain violation of the interests of the workers' and peasants' state (Soviet Union) and the toiling masses." (Code Civ. Proc., § 254 *b*.) In plain English, this means that if the court to which the motion to reopen is presented disagrees with the judgment, it may set it aside or reverse it. No judgment is ever truly final and res judicata never obtains. Court decisions are more akin to administrative than judicial determinations. (Gsovski, vol. I, pp. 536-540.)

### SOVIET LAWS DISCRIMINATING AGAINST ALIENS

There are many provisions in the Soviet Constitution and Soviet statutes which discriminate between the rights of citizens and aliens. Section 4 of the Civil Code provides:

"For the purpose of the development of the productive forces of the country, the R.S.F.S.R.[1] has granted legal capacity (the capacity of having private rights and obligations) to all *citizens* who are not restricted in their rights by sentence of court.

"Sex, race, nationality, religion, origin, have no bearing upon the scope of legal capacity." (Emphasis ours.)

Section 5 of the R.S.F.S.R. Civil Code provides: "in accordance with the foregoing, every *citizen* of the R.S.F.S.R. and other republics of the Soviet Union has the right to move about freely and to take residence within the territory of the R.S.F.S.R., to choose any occupation and profession not forbidden by law, to acquire and alienate property within the limitations established by law, to conclude legal transactions and to incur obligations, to organize industrial and commercial enterprises, subject to all regulations governing industrial and commercial activities and protecting employed labor." (Emphasis ours.)

Dr. Gsovski stated that the word "citizen," as used in these

---

[1]Russian Socialist Federated Soviet Republic. Prior to the creation of the U.S.S.R. on December 30, 1922, this was the name of the government controlled by the Communists. After the creation of the U.S.S.R., the R.S.F.S.R. became one of the S.S.R's. The R.S.F.S.R. legal codes were "copied" almost verbatim in the codes of the other republics. In the Georgian Republic the R.S.F.S.R. codes were translated into the Georgian language and became the law of the Georgian Republic. The R.S.F.S.R. codes are the most widely published and since they are identical in all significant respects to the Georgian codes, the code citations in this opinion will be to the R.S.F.S.R. codes.

sections, means citizens of the Soviet Union, and that the sections constitute a limited grant of legal capacity to Soviet citizens as distinguished from the concept that legal capacity is a natural quality of human beings. As used in section 4, the word "nationality" refers to the various national groups in the U.S.S.R. Section 10 of the U.S.S.R. Constitution, 1936, provides:

"The right of personal ownership by *citizens* of their earned income and savings, dwelling houses, and auxiliary household economy, household effects and utensils, objects of personal consumption and comforts as well as the right of succession in personal ownership of citizens shall be protected by law." (Emphasis ours.)

Dr. Gsovski stated that this constitutional provision grants to citizens only the right to personal ownership, the right to own houses and the right to inherit. Thus, only a narrow sphere of property rights is protected by the Soviet Constitution and this protection is afforded only to Soviet citizens. Under Section 6 of the U.S.S.R. Constitution, the land of the Soviet Union, its mineral wealth, waters, forests, factories, mines, surface transportation and air transportation, financial institutions and communication media, as well as the bulk of the dwelling houses in the cities, are declared to be state property. Since August 26, 1948, *citizens* have been permitted the use of a building lot for an undefined period of time upon which they may construct and occupy a small dwelling house. (Gsovski, vol. I, p. 1136; Edict of Presidium of U.S.S.R. of August 26, 1948.) The right of citizens to devise or transfer dwelling houses is specified in relevant statutes, provided of course that transfers do not involve an element of profit for the seller which would make the transfer a criminal offense. (R.S.F.S.R. Civil Code, § 182; R.S.F.S.R. Penal Code, § 87a.)

Further limiting the already meager rights of ownership granted Soviet citizens are the so-called "anti-parasite laws." The parasite elements, as defined in these laws, include not only loafers and vagrants, but also persons who live on unearned income, i.e., inheritances. Such persons are subjected to deportation for two to five years by a "popular judgment" of a meeting of citizens in the neighborhood without the case being tried in court. (See Gsovski, vol. II, p. 965.) Professor Berman, who offered advice to the trial court on Soviet law at the request of the Russian claimants, admitted the existence of such laws. Other Soviet laws limiting the occupations which aliens may participate in provide that aliens may not be

engaged as miners, crew members on civil aircraft, captains and mechanics on ships, or fishermen. The R.S.F.S.R. Land Code, section 9, provides that citizens of the R.S.F.S.R. who desire to till the land with personal labor shall have the right to the use thereof for farming. On February 15, 1947, an edict was made prohibiting marriages between aliens and Soviet citizens, thereby limiting the civil capacity of both groups.

These various edicts and decrees limiting the rights of aliens and the constitutional provisions limiting the grants of basic rights to citizens prompted the following statement in Soviet Civil Law, volume I, page 355:

"Regulation of private rights of aliens in the Soviet Union is to a large extent a matter of ever-changing policy and administration rather than of soviet legislation."

Section 14 of the Constitution grants the federal government jurisdiction to enact legislation concerning rights of foreigners, to determine the basic principles of land tenure and to legislate the criminal and civil codes. Thus, since 1936, the republics have had no right to legislate as to the rights of foreigners, the federal constitution having reserved that right to the central government. Since 1936, there has been no legislation in the Soviet Union as to inheritance rights of aliens and Professor Berman conceded that there is in existence no Soviet statute expressly granting rights of inheritance to aliens.

The Russian claimants in this case contend that legislation had been previously enacted (pointing to § 8 of the law enacting the R.S.F.S.R. Civil Code, hereinafter referred to as "Enacting Law") which inferentially establishes the rights of aliens to inherit. This law is in the form of a resolution of the All-Russian Central Executive Committee and was passed on October 31, 1922. Section 8 of the Enacting Law provides:

"8. The rights of citizens of foreign countries with which the R.S.F.S.R. has entered into agreements of one kind or another, shall be regulated by such agreements.

"Insofar as the rights of aliens are not provided for by agreements with the governments concerned or by special laws, the rights of aliens to move about freely within the territory of the R.S.F.S.R., to choose occupations, to open and to acquire commercial and industrial enterprises and rights in rem in buildings or in plots of land, may be restricted by order of the proper central organs of the government of the R.S.F.S.R., made in agreement with the People's Commissariat for Foreign Affairs . . ."

It can be readily seen that the first paragraph of the section has no application in this case because no agreement or treaty has been entered into between the United States and the Soviet Union with regard to the rights of nationals of these countries. Before analyzing the provisions of the second paragraph, it is necessary to paint in the background of historic circumstances which existed at the time the resolution was passed. The R.S.F.S.R. Civil Code was adopted before the official formation of the Soviet Union, which took place on December 30, 1922. Before this latter date, the relationships between the main Russian republic (R.S.F.S.R.), the Ukrainian, the Byelorussian (White Russian), the Georgian, the Armenian, and the Azerbaijan Republics, had been regulated by means of treaties, and the R.S.F.S.R. functioned like a confederate government. (Soviet Civil Law, vol. I, pp. 41-43; Gsovski, vol. I, pp. 14-21.)

At the time the Civil Code was adopted, the Communist Party, or the Bolsheviks, as they were then called, had concluded a victorious campaign to defeat opposition armies and governments, in the various republics. It was planned to set up a central government which would be supreme, but that a façade of home rule be permitted among the various republics having strong nationalistic tendencies, and that these arrangements would be provided for in a constitution which was being drafted at the time the R.S.F.S.R. Civil Code was enacted. Such a constitution was adopted in 1923, the year after the Civil Code was enacted. Subsequently, the R.S.F.S.R. Civil Code was enacted substantially verbatim in the other Russian republics and it has since been uniformly amended by federal legislation.

Examining section 8 of the Enacting Law in the framework of these historic events, it is apparent that the second paragraph in that section was intended to grant authority to the central government to provide for the rights of aliens, which grant would be effective until more specific provisions of the contemplated constitution became effective. These provisions did become operative and section 8 of the Enacting Law became obsolete or surplusage less than a year later on July 6, 1923, when the constitution was adopted. (Soviet Civil Law, vol. I, p. 43.) This constitution was of course later replaced and rendered nugatory by the Constitution of 1936, which is still in effect in Soviet Russia. Thus, the provisions of section 8 of the Enacting Law have been supplanted not once but

twice by constitutional provisions which regulate this same area of federal-state relations.

The Russian claimants, however, contend that the section operates still as a restriction on the rights of the state to limit the rights of aliens and contains an implied grant of the right of inheritance, since it does not provide that such rights may be restricted by the state. It might be observed that the section does not provide that the state may prohibit marriages between aliens and Soviet citizens, and yet this was prohibited by the federal government in 1947. The Russian claimants have pointed to no court decisions which place the construction which they contend for upon section 8. Their argument is based upon the theory that Russian laws should be interpreted with the principle that what is not prohibited is permitted. Dr. Gsovski stated that this rule of interpretation is not followed in the Soviet Union and he cited writings of leading Soviet legal experts to support his theory. In fact, Professor Goikhbarg, who was the principal author of the R.S.F.S.R. Civil Code, for a number of years after his authorship of the code, held the opinion that aliens had no right to inherit under Soviet laws. (Soviet Civil Law, vol. I, p. 25.) Apparently this opinion was later modified by Professor Goikhbarg, but other Soviet legal writers have held this opinion as recently as 1957, when Stalgevich maintained that this view of the question was correct. The broad interpretation of the statute which the Russian claimants urge upon this court is prohibited by section 5 of the Enacting Law which provides that extensive interpretation of the code is permitted only if required for the interests of the Soviet government. The Russian claimants have pointed to articles written by other Soviet legal writers which state that aliens do have the right to inherit property from Russian citizens. We are urged to accept such opinions as precedent which would be binding in Soviet courts, but have been directed to no statutes or court decisions which hold that the opinions of legal writers are considered precedent, binding upon Soviet jurists. The expert for the Russian claimants asserted, in a communication addressed to the trial court for its consideration in determining the nature of Soviet law, that such precedents were binding upon Soviet courts. He then relied upon these precedents, the validity of which he had himself established, as supporting his opinion that aliens have the right to inherit in the Soviet Union the same as Soviet citizens. This method of creating precedent and then relying on it tugs at our bootstraps but is incapable of levita-

tion. We have, however, examined an article translated from a Russian journal in which a Soviet lawyer, Cheburakhin, who is apparently employed in a quasi-governmental legal office (Iniurcolleuia) in the city of Moscow, where he deals primarily in the field of foreign estates. In support of his contention that foreigners enjoy the same legal capacity as Soviet citizens with regard to inheritance rights, this author merely cites section 8 of the Enacting Law and states: It is clear that the general rule is that citizens of foreign countries possess the same civil rights as Soviet citizens.''

No further analysis of the section or its historic background is offered, although the author does go on to state some of the circumstances of a few cases in which foreigners received money from estates of Soviet citizens. We are not concerned with this latter portion of his article, since the California law enjoins upon us a determination of the rights of our citizens in foreign countries and not the privileges which foreign countries might confer upon them. As for the author's analysis of the code section, we know of only one authority which might justify the suggested method of construction:

'' 'When I use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.' 'The question is,' said Alice, 'whether you *can* make words mean so many different things.' 'The question is,' said Humpty Dumpty, 'which is to be master—that's all.' '' (Carroll, Through the Looking Glass, ch. 6.) Moreover, in his article, Cheburakhin admits that Stalgevich disagrees with his opinion. As outlined by Cheburakhin, Stalgevich's reasoning is that the civil code grants legal capacity only to citizens. Therefore, aliens do not have civil legal capacity and the right to inherit in the absence of an intergovernmental treaty or agreement granting them such rights. We deem Stalgevich's construction of these statutes to be correct and indeed the only possible construction which can be arrived at without ignoring the provisions of R.S.F.S.R. Civil Code section 4.

Dr. Gsovski called to the attention of the court the fact that the Ministry of Justice of the R.S.F.S.R. published in 1959 a collection of legislation of the U.S.S.R. and the R.S.F. S.R. and directives and judicial practices of the U.S.S.R. Supreme Court on the subject of inheritance. Although this collection of laws was comprehensive and included international treaties made by the Soviet Union with other countries

on the subject of inheritance, it did not include Section 8 of the Enacting Law. This fact of itself would have little weight in our determination of this issue, but it reinforces the conclusion that section 8 of the Enacting Law affords no protection of the rights of aliens to inherit in the Soviet Union.

### Wills and Intestacy In the Soviet Union

In the Soviet Union, a will must be in writing, signed by the testator and certified. Certification may be accomplished by the People's judge or the local Soviet, but notaries usually perform this function. After certifying a will, a notary files the original as an official record and returns a certified copy to the testator. When the will is presented to him for certification, the notary determines whether or not the will is contrary to law. (Soviet Civil Law, vol. I, p. 645.) Holographic and privately made wills are invalid under Soviet laws. (R.S.F.S.R. Civ. Code, §§ 29, 425.)

In the Soviet Union, notaries are appointed by local ministries of justice and they function as government agents, keeping public records in which all notarized documents are kept, issuing certified copies thereof. They also handle the supervision of the administration of estates and issue certificates attesting to succession rights. (Soviet Civil Law, vol. I, pp. 851-852.)

Thus, before a citizen of the Soviet Union can will property to foreign heirs, he must have the approval of an agency of the government and must place the government on notice as to his intentions. Furthermore, if such a will is certified by the notary, it becomes a public record. This contrasts sharply with the law of the United States and the State of California, where the execution of a will is considered a private act and its contents may, quite properly, be kept a secret, sometimes shared in confidence with the testator's attorney. True, many wills are witnessed, but the witnesses may be, and often are, the attorney and his associates, and thus bound by the pledge of professional confidence. Indeed, if a testator so desires, in this state he may draft a valid holographic will and keep its contents completely secret. Wills are required to be made matters of public record only after the testator's death, when they are presented for probate. (Cal. Prob. Code, §§ 320, 323 and 326.) By this time, the testator is beyond the reach of any irate devisees, legatees or persons who may be omitted in the will. Of course, in this nation, even if the government were somehow, during a testator's lifetime, to obtain information as to the contents of a testator's will, it could not prop-

erly, nor would it dare, bring action against him by legal means or otherwise to interfere with his dispositions.

In the Soviet Union, conditions are far different. The government is all-powerful, being able to summon at will public opinion through the press, economic sanctions through government-owned enterprises and, last but not least, the assistance of the police and prosecutors backed by a plethora of criminal statutes and the still more numerous and undefinable ''crimes by analogy.''

Reinforcing these pressures which undoubtedly would be brought against a testator desiring to will his property to a citizen of the United States is the fact that one of the basic attributes of the Communist Party of the Soviet Union is and has been an uncompromising hostility toward the major western nations and their people and toward the ideals of liberty and freedom exemplified by their political and economic systems. This officially sponsored xenophobia is pressed with particular fury against the United States. The official party line characteristically portrays western nations as oppressive, conspiratorial and predatory. Innumerable events evidencing this hostility have occurred in recent years. For example, groups of demonstrators evidencing official organization and unhindered by police attacked the American Embassy in Moscow in 1958 and 1960.

In *Estate of Karban,* 118 Cal.App.2d 240, 244 [257 P.2d 649], the court stated the purpose underlying Probate Code, section 259, as follows: ''The underlying purpose of the section was to prevent the property in decedents' estates, or the proceeds thereof, being sent into foreign countries whose laws did not give reciprocal rights of inheritance to our citizens. In the statement made by the California Legislature when it first passed the reciprocity statute it was declared that *many foreign countries were at war, preparing for war, or under the control of conquering nations; that money left to citizens of California in such foreign countries was impounded there or used for war purposes;* that money left by California decedents to relatives in those countries did not reach them, but was used by their governments; and that property *and money of persons dying in this country should remain here and not be sent to foreign countries and be used in waging a war that eventually might be directed against the United States.''* (Emphasis ours.)

The Soviet Union, by its laws and conduct, has placed itself within the definition of nations which do not grant

reciprocity to our citizens and which are preparing for war and impound funds for use in waging war that eventually might be directed against the United States.

If a Soviet citizen should desire to leave a portion of his estate to aliens and keep this intention secret, he might attempt to do so by not making a will at all and permitting his estate to pass by intestacy. However, the circle of heirs who take by intestacy is narrow, being limited to children, grandchildren, great-grandchildren, brothers and sisters and parents. If the nearest heirs were, as here, nephews, the estate would escheat to the Soviet Union. (R.S.F.S.R. Civ. Code, § 418.)

Soviet law requires an heir to accept the inheritance whether he is a testamentary beneficiary or an heir by operation of law. (R.S.F.S.R. Civ. Code, §§ 429, 430.) However, heirs present "in the place of the opening" of the succession who do not renounce their rights within three months are presumed to have accepted the inheritance and need not submit an express acceptance. An absent heir, on the other hand, must expressly declare his acceptance of the inheritance in person or through an agent within six months after the opening of the inheritance. If he does not do so, his portion of the estate may devolve upon other heirs or escheat to the state. In 1958, the U.S.S.R. Supreme Court held that the fact that an heir is an alien residing in a foreign country does not extend the six-month limitation period. The R.S.F.S.R. Civil Code states: "Notification of heirs by means of publication or by any other means shall not be made, but the notarial office at the place where the succession opens shall take measures to protect the estate, if such office deems it justifiable in the interests of the State or of the heirs." (R.S.F.S.R Civ. Code, § 431.)

In a 1939 instruction of the People's Commissar for Justice, notarial officers were ordered to advise the absent heirs if their addresses are known. However, the statute was not amended. Since notarial practices are not reported, it is impossible for this court to determine the regularity with which notaries take measures for the safeguarding of estates or send notices to absent heirs. Even if the notary takes measures to safeguard the estate, such measures shall not exceed six months in duration and if the measures are not taken the heirs who are present may assume management of the inherited property without awaiting the appearance of other heirs. (R.S.F.S.R. Civ. Code, §§ 429, 431.) These statutes place Soviet heirs residing at the place of the testa-

tor's death in a comparatively advantageous position vis-à-vis foreign heirs.

### LACK OF LEGAL RIGHTS IN THE SOVIET UNION

■ As used in jurisprudence, the term "right" connotes the capacity of asserting a legally enforceable claim. Legal rights have been classified as substantive and remedial. ■ Substantive rights are those existing for their own sake and constituting the normal legal order of society, i.e., the rights of life, liberty, property and reputation. ■ Remedial rights arise for the purpose of protecting or enforcing substantive rights. (*In re Krachler's Estate, supra,* 199 Ore. 448 [263 P.2d 769] ; Webster's New International Dictionary (Springfield, Mass. 1954), p. 2147; Black's Law Dictionary (4th ed.), pp. 1486-1487.) ■ One of the indispensible qualities of a legal right is the certainty that the state will recognize its existence and assist in its enforcement. If the person asserting a claim can predict with certainty that it will be enforced by the courts, he has a legal right—otherwise, his claim remains an inchoate "right" without a remedy. ■ If a claim can be granted or denied in the discretion of the state and is so granted, the recipient has been granted a *privilege.* See Corbin, *Legal Analysis and Terminology,* 29 Yale L. J. 163, reprinted in Landmarks of Law (Harper & Brothers, 1960) p. 196. The distinction between rights and privileges lies chiefly in the certainty with which the former may be asserted and enforced.

■ Natural rights are those which grow out of the nature of man and depend upon his personality and are distinguished from those which are created by positive laws enacted by a duly constituted government to create an orderly civilized society. These latter rights are often referred to as civil rights. ■ They are the rights which belong to every citizen or inhabitant of the state and are normally defined in positive laws enacted and enforced by the government of an organized society.

Soviet legal theory denies that natural rights exist and asserts that all "rights" are grants bestowed by the government upon its citizens. Section 1 of the R.S.F.S.R. Civil Code provides : "The law protects private rights except as they are exercised in contradiction to their social and economic purpose."

Section 4 of the same code grants legal capacity (i.e., the capacity of having legal rights) to citizens "for the purpose

of developing the productive forces of the country.'' These qualifications conditioning the grants of rights to Soviet citizens are very similar to the condition contained in inheritance laws of Nazi Germany whereby such laws were to be disregarded if the distribution of the estate was contrary to "healthy national sentiment." See *Estate of Leefers,* 127 Cal. App.2d 550 [274 P.2d 239].

By these formulas, the framers of the Soviet codes sought to suspend a Damocles' sword over private rights. (Gsovski, vol. II, p. 1127.) The Soviet legal theorists and courts have been unable to clearly define the socioeconomic purpose of a right. The most recent comprehensive Soviet legal treatise on civil law contains the following broad definition: "The social and economic purpose of personal ownership consists of satisfying the personal needs of a citizen, while the use of personal ownership (and) property rights for obtaining an unearned income is not only unprotected by Soviet law but is also prosecuted. . . . In general, making any use of rights for the purpose of contradicting the interests of the Soviet State is illegal. Any behavior conflicting with the interests of a socialist society may not enjoy protection." (Gsovski, vol. II, p. 1129.)

Dr. Gsovski stated that there is no such thing as a legal right in the Soviet Union and that Soviet laws confer mere privileges upon citizens. These privileges can be arbitrarily curtailed or withdrawn at any time.[2]

In a Treasury Department regulation reported in 16 F.R. 1818, February 27, 1951, it was determined that: "Postal, transportation or bank facilities in general or local conditions . . . the Union of Soviet Socialist Republics . . . are such that there is not a reasonable assurance that a payee in those areas will actually receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and be able to negotiate the same for full value."

In the case of *In re Zupko's Estate* (Penn.), 15 D. & C. 2d 442, the court took judicial notice of this regulation and observed that the Soviet government was interfering with the rights of its citizens in that it diverted to itself the major portion of funds transferred to them from sources outside the Soviet Union.

[2]See The Anatomy of Terror (Public Affairs Press, 1956); U.S.S.R. (Hraf Press, 1960) pp. 405-408; and Current Soviet Policies III The Documentary Record of the Extraordinary 21st Congress of the Communist Party of the Soviet Union (Columbia University Press, 1960).

The Soviet Union also exercises direct control over all payments in foreign exchange and such payments are made exclusively through the U.S.S.R. State Bank. The government maintains absolute control over the rate of exchange as well as determining whether transfers will be permitted at all. The Russian claimants have called to our attention a decree of the Council of Ministers of April 21, 1955, which provides:

"The Council of Ministers of the U.S.S.R. decrees:

"(1) That funds in estates that are due to foreigners shall be freely transferred from the U.S.S.R. abroad, on condition that there is mutuality on the part of the correspondent foreign state.

"(2) That the Ministry of Finance of the U.S.S.R., with the consent of the State Bank of the U.S.S.R., shall be commissioned to establish a procedure for transfer abroad of funds in estates."

Professor Berman first called the court's attention to this decree and said that he had first seen it when it was shown to him in Moscow by Cheburakhin, who urged that the decree proved that aliens could inherit Soviet estates. However, Cheburakhin, in his article concerning inheritance rights of foreigners, written in August 1957, after the issuance of the decree, did not mention it. Dr. Gsovski stated in 1959 that he had never seen the decree published and doubted its existence. After Dr. Gsovski's statement, the decree was then published in November 1959. We must conclude that this decree was secret even from Cheburakhin, a Soviet lawyer dealing with foreign estates, until some date between 1957 and 1959. The wording of the decree does not assist us in determining what estates are due to foreigners and since the Soviet Union has treaties with various countries as to the inheritance rights of aliens, it could well refer to estates involving inheritance by aliens residing within countries with whom the Soviet Union has by treaty regulated the question of inheritance. Furthermore, we are reluctant to give weight to the decree, since its repeal may be as readily kept a secret as its initial publication. In any event, the joint resolution of the Central Executive Committee and the Council of People's Commissars of the U.S.S.R. of January 7, 1937, which grants the state bank the exclusive authority to deal in foreign exchange in the Soviet Union, provides: "The U.S.S.R. People's Commissariat for Finance shall be authorized to make exceptions in individual cases to the present resolution."

Therefore, the Commissariat for Finance has the uncontrolled discretion to pay or not to pay foreign heirs.

We hold that there is no such thing as a "right" in the U.S.S.R. as we understand it in this country. Soviet statutes merely confer conditional rights or privileges which, being granted by the grace of the government, may be withdrawn without the consent of the citizen at the whim of the government. That the Soviet Union may, as a matter of practice, permit certain United States citizens to inherit from Soviet estates does not alter our opinion. Such a practice, granted and followed as a matter of expediency and shrewd business, does not establish an enforceable legal right on the part of American legatees. (*In re Krachler's Estate, supra,* 199 Ore. 448 [263 P.2d 769].)[3]

## Conclusion

We are convinced and therefore hold that no reciprocal rights of inheritance existed between the United States and the U.S.S.R. as of August 14, 1956. We base this conclusion upon the following points:

1. Residents and citizens of the United States have no rights under Soviet law as the term "right" is employed in Probate Code, section 259.

2. Because of the existence in the Soviet Union of secret laws, and unrepealed obsolete laws, and the recognition of ex post facto laws, it is impossible to ascertain with certainty the state of Soviet law on any issue.

3. Under such Soviet constitutional provisions and published laws as are available for scrutiny by this court, there is express discrimination against nonresident alien heirs.

4. The laws and statutes of the U.S.S.R. do not give citizens and residents of the United States the right to inherit in the Soviet Union. Such rights cannot be implied as contended by the Russian claimants.

5. There are no treaties or agreements between the United States and the Soviet Union respecting reciprocal rights of inheritance.

[3]According to data taken from the Annual Report of the Immigration and Naturalization Service 1960 (Washington, D. C., 1960), there were over 147,000 aliens who were born in the Soviet Union residing in the United States in 1960 and there were over 431,000 aliens residing in the United States who were born in the Iron Curtain countries. In view of the increased opportunities for acquiring property and estates in this country it can readily be seen why it would be expedient for the Soviet Union to provide channels whereby American estates could be transferred to the Soviet Union.

Therefore, the judgment should be reversed and the remaining issues between the State of California and the United States of America should be determined by the trial court.

Judgment reversed with directions to the trial court to determine the remaining issues. Each party to pay own costs on appeal.

Shepard, J., and Coughlin, J., concurred.

A petition for a rehearing was denied October 6, 1961, and respondents' petition for a hearing by the Supreme Court was denied November 8, 1961.